## Case No. 17,133.

### WALTON v. CROWLEY.

[3 Blatchf. 440; Cox. Manual Trade-Mark Cas. 78; Cox, Am. Trade-Mark Cas. 166.] [1]

Circuit Court, S. D. New York.    March 19, 1856.

TRADE-MARKS — RIGHT TO USE ON PURCHASED GOODS—ASSIGNMENT—INFRINGEMENT —EVIDENCE.

1. On the facts in this case it was *held*, that the plaintiff was entitled to maintain a suit in equity in his own name for an injunction and relief, for the infringement of a trade-mark.

[Cited in Hostetter v. Vowinkle, Case No. 6,714.]

2. The owner of goods, which he exposes to sale in market in his own right, is entitled to the exclusive use of any trade-mark devised and applied by him to the goods, to distinguish them as being of a particular manufacture or quality, although he is not himself the manufacturer, and although the name of the real manufacturer is used as part of the trade-mark; and the assignee of the whole right in such trade-mark, and of the property in the goods to which it is attached, is entitled to the enjoyment of the exclusive right thereto, and may maintain an action, in his own name, for any wrongful use by others of such trade-mark, to the like extent as the originator thereof.

[Cited in Hostetter v. Vowinkle, Case No. 6,714. Cited in brief in McLean v. Fleming, 96 U. S. 253.]

[Cited in brief in Caswell v. Davis, 58 N. Y. 226. Cited in Fischer v. Blank (Sup.) 19 N. Y. Supp. 66; Glen & H. Manuf'g Co. v. Hall, 61 N. Y. 235; Godillot v. Harris, 81 N. Y. 267.]

3. In this case it was *held*, that the mere affidavit of the defendant, without a formal answer, denying that the trade-mark claimed was the original device of the plaintiff's assignor, or was first adopted by him, was not sufficient to bar the equity of the plaintiff, arising out of the facts charged in the bill, and his long undisturbed possession and use of the trade-mark, corroborated, as his right was, by after acts and declaration of the defendant.

4. The privilege of a party to the exclusive enjoyment of a trade-mark, does not rest upon a right of property therein, but on its prior use and application in the manner in which it has been imitated and employed by the defendant.

5. A tradesman, to bring his privilege of using a particular trade-mark under the protection of equity, is not bound to prove that it has been copied in every particular by another. It is enough for him to show that the representations employed bear such resemblance to his as to be calculated to mislead the public generally who

are the purchasers of the article, and to make it pass with them for the one sold by him.

[Cited in Filkins v. Blackman, Case No. 4,- 786; Amoskeag Manuf'g Co. v. Trainer, 101 U. S. 67; Humphrey's Specific Homeopathic Medicine Co. v. Wenz, 14 Fed. 254; Atlantic Milling Co. v. Robinson, 20 Fed. 219; Liggett & Myer Tobacco Co. v. Hynes, Id. 885; Morgan v. Rogers, 19 Fed. 597.]

[Cited in Gilman v. Hunnewell, 122 Mass. 152. Cited in brief in Holmes, Booth & Haydens v. Holmes, Booth & Atwood Manuf'g Co., 37 Conn. 284; Palmer v. Harris, 60 Pa. St. 157.]

In equity. This was an application for a provisional injunction, founded upon a bill and an affidavit of the plaintiff [Henry Walton]. It was opposed upon an affidavit of the defendant [Robert Crowley], without any answer. The bill set forth, that one James Smith, in England, had, under the name of James Smith & Son, been for 20 years a manufacturer of needles for sewing; that, more than 20 years ago, Smith agreed with the plaintiff's father, James Walton, who resided in Philadelphia, that he should be the sole purchaser of all the needles made by Smith which should come to the United States; that this agreement was carried out by Smith, and all the needles made by Smith which came to the United States were sent to the plaintiff's father, packed under his direction, and were sold by him in papers having on them printed labels, devices and trade-marks, which were devised and first used by him, the words "Jas. Walton" being also on each paper, in small writing letters; that the labels covering the first quality of needles were printed on a red ground; that such red ground formed a part of the trade-mark; that, on account of the merit of the needles, and the care and expense in devising and applying the labels, devices and trade-marks, the needles had acquired a standard value in the United States; that the annual sales of the plaintiff's father, under his exclusive contract, averaged from 20 to 25 millions of needles each year; that, on the 1st of July, 1851, the plaintiff became, by assignment from his father, proprietor of the whole of his business, good-will and trade in vending the needles made by Smith, and of all the right to use such devices, labels and trade-marks, and was, by the assent of Smith, substituted in place of his father, in the exclusive right of purchasing such needles for sale in the United States; that the plaintiff had since continued annually to sell, in the United States, from 20 to 25 millions of such needles, in papers covered by such labels, devices and trade-marks, in pursuance of such assignment; that he had recently discovered that the defendant had counterfeited such labels, and had been selling, in the United States, needles with such counterfeited labels, of inferior quality, and at a less price than the price at which the plaintiff could afford to sell such needles with genuine labels; that such counterfeited labels were such close imitations as readily to deceive the public, and especially hundreds of uneducated women and workmen who buy

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission. Cox, Manual Trade-Mark Cas. 78, contains only a partial report.]

needles by retail; that none of the needles sold by the defendant under the counterfeited labels were ever made by Smith, nor in England; that the defendant got up the labels knowing that the plaintiff was the exclusive importer of Smith's needles, and that no one else was entitled to import them into the United States with such labels; and that the defendant, when selling such needles, described them, in bills rendered, as "Smith's needles."

A schedule to the bill contained three of the plaintiff's labels, with needles enclosed, as made up for selling. No. 1 had a label on the front and another label on the back. The label on the front was printed in white letters, on a red ground, occupying 9 lines, and was as follows: "Jas. Smith & Son. (A crown.) Genuine Drill'd Ey'd Sharps. (7) Warranted. Jas. Walton," (in writing characters). The label on the back was printed in black letters, on a red ground, occupying 13 lines, and was as follows: "Manufactured and warranted by Jas. Smith & Son, Astwood, near Redditch. Beware of the imitation labels. The genuine are signed Jas. Walton," (in writing characters). No. 2 of the plaintiff's labels was, both as to its front and its back, like No. 1, except that instead of "(7)" it had "(9)," and the red ground of the front of No. 2 was lighter than the red ground of the front of No. 1, and the red ground of the back of No. 2 was a different shade of red from either the front or the back of No. 1, or the front of No. 2. No. 3 of the plaintiff's labels was a front label, like the front of No. 1, except that, instead of "(7)," it had "(5)," and was a larger sized label than the front of No. 1, and the red ground was a different shade of red from the front of No. 1. A schedule to the bill contained specimens of the labels used by the defendant. They were three in number. No. 1 had its front printed in white letters on a red ground, and its back printed in black letters on a red ground. The front of No. 1 occupied 9 lines, and was as follows: "Jas. Smith & Son. (A crown.) Genuine Drill'd Ey'd Sharps. (7) Warranted. R. Crowley," (in writing characters). The color of the red ground of the front of No. 1 of the defendant's labels, was the same shade of red as the red ground of the front of No. 1 of the plaintiff's labels. The back of No. 1 of the defendant's labels occupied 13 lines, and was as follows: "Manufactured for Jas. Smith & Son, and warranted by (R. Crowley). Beware of the imitation labels. The genuine are signed R. Crowley," (in writing characters). The color of the red ground of the back of No. 1 of the defendant's labels, was the same shade of red as the red ground of the back of No. 1 of the plaintiff's labels. The front of No. 2 of the defendant's labels was like the front of No. 1 of the defendant's labels, except that, instead of "(7)," it had "(8)." The back of it was like the back of No. 1 of the defendant's labels. The front of No. 3 of the defendant's labels was like the front of No. 1 of the defendant's labels, except that, instead of "(7)," it had "(5 to 10)." In the labels of the plaintiff and of the defendant, the figures were in a circle and were printed in white. The labels of the defendant and of the plaintiff were all of them pasted on a black piece of paper, in which the needles were contained.

The affidavit of the plaintiff set forth that, on the 12th of January, 1856, the defendant called on the plaintiff, in Philadelphia, after this suit was commenced, and said he had called to see if he could make an arrangement to stay proceedings in the suit, that he had made the labels, not for himself, but for J. H. Smith & Son, of Baltimore, that he received from them an order to make the labels, and made them according to their instructions, that they were insolvent, and that, in consequence, the needles and labels still remained in the defendant's hands; that he proposed that the plaintiff should appoint some one to go to New York, and take possession of the counterfeits on hand, and take off the labels, and return the needles to the defendant; that the defendant proposed to pay all the expenses that might be incurred by such proceedings, and to pay all counsel fees and court charges in the suit, provided the plaintiff would stay proceedings in it, and said that, if the plaintiff would not agree to that proposition, he, the defendant, had plenty of money to spend in law, and had much experience in law matters; that the plaintiff told the defendant that his excuses and propositions were lame, that he had not asked the plaintiff's permission to use the labels, and that the plaintiff, would seek the protection of the law against all infringements of his rights; that he had made search concerning said J. H. Smith & Son, and had reason to believe, that no such firm now existed, or had for many years existed, in or near Baltimore; and that the defendant's statement relative to the existence of that firm and the order for the labels was wholly fictitious. The affidavit of the defendant set forth that, for more than 20 years, he had been a manufacturer of and dealer in sewing needles in the United States, and had acquired an extended reputation, and his name, as manufacturer and warrantor, on the labels covering such needles, was much relied upon; that, on the 10th of August, 1854, he received an order from James Smith and James H. Smith, doing business in Baltimore, under the style of James Smith & Son, for 732,000 needles, in papers of 25 needles in each, to be labelled with the name of said James Smith & Son, and the name of the defendant to be put thereon as manufacturer and warrantor, the labels to be on a red ground, with the device of a crown thereon, making a label similar to labels of that description in general use by the trade, and which were then and there spoken of or referred to, and of which those annexed to the bill and those annexed to the defendant's affidavit were specimens and ex-

amples; that the labels and devices in the schedule annexed to the defendant's affidavit, or most of them, had been in use by the trade, in the United States, for a long period and quite as long as the use thereof by the plaintiff; that the red ground and a crown thereon had been commonly used in England by the trade for upwards of 30 years, and prior to the use thereof by James Smith, or James Smith & Son, of England, or the plaintiff; that it was a common label; that the defendant had never heard of any person's claiming an exclusive right to its use except the plaintiff, nor of his claim until the commencement of this suit; that the words on the labels, "genuine drill'd ey'd sharps," were words of universal use in the trade, and were so used to distinguish the quality and character of the needles enclosed, as was also the figure on the labels, which merely indicated the size of the needles; that the plaintiff was not the only manufacturer of "genuine" needles, or of "drill'd ey'd" needles, or of "sharps," but that the same were made and so styled by every needle manufacturer, those words being well understood as merely descriptive of the style and character of the needle; that, in pursuance of the order of said James Smith & Son, the defendant got up for them, by way of sample, a few thousands of the labels referred to in the bill, but that, they having failed about that time, their order was never fulfilled, and no more of the labels were ever got up: that only a portion of those that were got up were delivered to said James Smith & Son, and that, the balance being left on the defendant's hands, he was authorized by said James Smith & Son to sell them for his own benefit, and had disposed of some portion of them; that it was untrue that the plaintiff's label, annexed to the bill, was devised and first used by the plaintiff's father, or by James Smith, or James Smith & Son, of England, but that, at the time the plaintiff's father commenced to use it, it was a common label; that it was untrue that the label got up by the defendant was got up in fraud of the plaintiff, or with a view of obtaining sales which would otherwise be made by the plaintiff, or with a view of deceiving the purchasers of needles; that it was untrue that the defendant's labels were intended to be an imitation of the plaintiff's, but that the difference was easily perceptible, in the sale thereof; that it was never pretended by the defendant that his needles were the plaintiff's needles; that the plaintiff's needles and the defendant's needles had always had on them the back label; that such back label was originally used about 50 years ago by R. Hemming & Sons, whose back label was exhibited in a schedule annexed to the defendant's affidavit; that the plaintiff's back label was an imitation thereof; and that the use of a crown, upon labels covering needles, was first adopted by the defendant's father, and used by him 40 or 50 years ago. A sched-

ule annexed to the defendant's affidavit contained various specimens of front labels of various manfacturers of needles, all of which were printed in white letters on a red ground, and were 48 in number. Of these 48, 47 had upon them a crown, 41 had upon them the words, "drill'd ey'd sharps," and 32 had upon them the words, "genuine drill'd ey'd sharps, warranted." Of these 32, 22 had figures in circles, printed in white, 4 having so printed "5 to 10," 7 having so printed "5-10," and 11 having so printed single figures. The words in said 48 specimens of labels were arranged in lines under each other, in the same manner as in the plaintiff's and the defendant's labels. The back label before referred to of R. Hemming & Sons, was printed in black letters on a green ground, and was half the length of the plaintiff's back label. It occupied 5 lines, and read thus: "Manufactured and warranted by R. Hemming & Sons, Forge-Needle-Mills, Redditch."

Charles Edwards, for plaintiff.
Daniel D. Lord, for defendant.

BETTS, District Judge. On ordinary observation, the labels used by the two parties in this case would not be apt to be distinguished the one from the other—the size, shape, vignette, coloring and marking being so nearly identical as to make them easily pass for the same, and the only difference discernible, on considerable scrutiny, being in the name of the warrantor, stamped upon them in letters so small as not readily to attract notice.

It is this apparent similitude or counterfeiting which is the grievance complained of. A tradesman, to bring his privilege of using a particular mark under the protection of equity, is not bound to prove that it has been copied in every particular by another. It is enough for him to show that the representations employed bear such resemblance to his as to be calculated to mislead the public generally who are purchasers of the article, and to make it pass with them for the one sold by him. If the indicia or signs used tend to that result, the party aggrieved will be allowed an injunction staying the aggression until the merits of the case can be ascertained and determined. 2 Story, Eq. Jur. § 951; 2 Kent, Comm. (7th Ed.) 453, notes.

I cannot regard the denial by the defendant's affidavit alone, of the equity of the bill, as sufficient to defeat the motion for an injunction, resting, as it does, upon the positive oath of the plaintiff, and his long and unquestioned use of his design and mark. The affidavit has not the weight and effect of an answer. The allegations of the bill are, moreover, corroborated by facts set up in an additional affidavit, and not denied by the defendant, that he offered to destroy the labels prepared by him, and pay the expenses incurred by the plaintiff in this action, if the suit could be stayed, and by the further statement, not denied or explained

by the defendant, that no such persons or firm as those named in the defendant's affidavit, as having ordered the labels prepared by him, could be discovered, or heard of, in Baltimore, on inquiry there for them. These are matters of signal importance, and demanded a clear explanation by the defendant in his affidavit, addressed to the equitable consideration of the court.

The case is, in its general features, plainly within the scope of those cases over which courts of equity exercise the jurisdiction now applied for. The principles of the rules upon which injunctions are granted to suppress this description of wrong, and the extent to which the relief is carried, are largely discussed and distinctly settled in the summary of the adjudications, in late publications. 2 Kent, Comm. (7th Ed.) 473, and notes; 2 Eden, Inj. (by Waterman) 271, notes; 2 Story, Eq. Jur. § 951.

It is objected that the bill is defective in substance because James Smith & Son are not made parties, and that an injunction will be denied upon a bill which would be pronounced virtually insufficient on demurrer. Bills of this description are not maintainable upon the ground that the plaintiff has a right of property in the trade-mark. The relief is given because the mark is a sign or representation, importing, and so understood and acted upon by the public, that the article to which it is attached is the manufacture or production which is generally known in market under that denomination. Coffeen v. Brunton [Case No. 2,946]. The owner of the goods which bear the indicia is considered to be prejudiced in his interests if others can be permitted to come into the market with the same representation, and thus delude purchasers by vending inferior articles, or diminish the owner's .business by acquiring sales to themselves under color of his reputation. The party, then, whose interests are directly affected by the wrong, is entitled to proceed in his own name to procure its suppression; and the person for whom goods are manufactured has the same legal right to affix and maintain a special trade-mark, as the manufacturer himself. Amoskeag Manuf'g Co. v. Spear, 2 Sandf. 599; Taylor v. Carpenter, 2 Sandf. Ch. 614.

The plaintiff was not the inventor of this label or trade-mark, nor the one who originally adopted it, but he is the assignee of it, and of the good-will of the trade. He stands, thus, in the same relation to the defendant as his assignor would, and whatever privilege the law accorded to James Walton, in the possession and use of the trade-mark, passed to and can be enjoyed by the plaintiff under the assignment.

I think that the plaintiff is entitled, upon his bill .and the proofs before me, to an injunction in the cause, until the further order of the court. Order accordingly.