FISCHER et al. v. BLANK.

(Supreme Court, General Term, First Department. May 13, 1892.)

TRADE-MARKS—COLOR AND SHAPE OF PACKAGE—INFRINGEMENT—INJUNCTION.

Where a dealer in merchandise adopts a certain color and shape of wrapper therefor to designate the article, a rival dealer in a similar article will be enjoined from using a wrapper afterwards adopted by him, which is of the same size, shape, and color, and contains thereon a similar grouping of symbols, so as to readily mislead purchasers into believing that the article is that put up and sold by the first dealer, though on an inspection the symbols and words printed on the wrapper may appear different.

Exceptions from circuit court, New York county.

Action by Benedickt Fischer and others against Berthold Blank to enjoin defendant from using wrappers, labels, and packages alleged to infringe those used by plaintiffs, and for an accounting of profits and damages. The court made findings of fact and conclusions of law, and entered an interlocutory judgment for plaintiffs. Defendant moves for a new trial upon exceptions to the findings and refusals to find, under Code Civil Proc. § 1001. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and ANDREWS, JJ.

Rowland Cox, for plaintiffs.    Charles Goldzier, for defendant.

ANDREWS, J. This action is brought to restrain the defendant from an alleged infringement of plaintiffs' wrappers, labels, and packages used in the sale of tea, and of their alleged trade name of "Black Package Tea," and for an accounting of profits. The special term found that about February, 1888, the plaintiffs were dealers in teas, and, for the purpose of identifying their tea, adopted a black wrapper, upon which appeared a number of peculiar labels, and a certain style of package containing such tea; that at the same time they adopted as a designation of such tea the term "Black Package Tea;" that since the year 1888 their tea has been known and identified in the market as "Black Package Tea," and that there has existed a large and increasing demand for the same; that the plaintiffs' "Black Package Tea" was and is consumed chiefly by ignorant and illiterate people, and is to a large extent sold by retail dealers whose places of business are in cellars and dark stores, and where the exact appearance of the article was and is not likely to be readily observed; that plaintiffs' tea is of a superior quality, and of that particular kind known to Russians as "Russian Caravan Tea;" that, after plaintiffs placed their "Black Package Tea" upon the market, and a demand for the same had been created, the defendant made use of, to inclose tea not of plaintiffs' selection and importation, a black wrapper, with labels upon the same, and that such wrapper and labels are imitations of those of the plaintiffs, and are so nearly like those of the plaintiffs that there is danger of the defendant's wrapper being mistaken for that of the plaintiffs; that the packages containing the defendant's tea are of the same size and shape as those which contain the plaintiffs' tea, and that the defendant's packages are so nearly like those of the plaintiffs that there is danger of the one being mistaken for the other; that the defendant's tea has been handed out and sold when plaintiffs' "Black Package Tea" has been asked for; that the defendant's packages of tea were by the defendant caused to be devised and arranged so as to resemble plaintiffs' packages, with the intent, and to the end, that defendant's tea might be sold in lieu of the plaintiffs'.

We are of the opinion that the above-mentioned findings, and others, made by the special term, are sustained by the testimony given upon the trial on behalf of the plaintiffs. The use by the defendant of certain wrappers, and of a certain style of package, is not denied, and there is some evidence that persons desiring to purchase the plaintiffs' tea have been misled, and have taken defendant's tea, supposing it to be that of the plaintiffs. The purchasers are for the most part foreigners, many of whom are very illiterate,

and cannot read, and it is sold in many cases in dark shops and cellars, where there is not sufficient light to enable a person to distinguish between packages which bear a general resemblance to one another. The mere inspection of the packages which were submitted to us upon the argument is sufficient to satisfy us that the packages of the defendant are so similar to those of the plaintiffs that persons buying under such circumstances might easily mistake the packages of the defendant for those of the plaintiffs. The packages of the defendant are of the same shape and size as those of the plaintiffs; the paper of the wrappers is of the same color; the pictures and symbols are of the same color; the size and color of the labels on the end are the same. The pictures and symbols, though different from those on the plaintiffs' packages, are arranged in a similar manner. The differences between the packages can be seen upon a close inspection, but without such inspection the general appearance of the defendant's packages is so nearly the same as that of the plaintiffs' packages that any person, whether illiterate or not, if making a purchase in a place where the light was not good, would readily mistake the packages of the defendant for those of the plaintiffs; and such inspection satisfies us that the object and the intent of the defendant was to put up his tea in packages so similar to those of the plaintiffs that they would be mistaken for the packages of the latter, and yet that the differences upon the wrappers should be such that the plaintiffs would not be able to maintain an action to restrain the defendant from selling his tea in such packages. The law is well settled that, where a defendant is endeavoring by such means to palm off his goods upon the public as the goods of another, a court of equity will restrain him. "A tradesman, to bring his privilege of using a particular mark under the protection of a court of equity, need not prove that it has been copied in every particular. It would be sufficient to show that the devices employed bear such a resemblance to his as to be calculated to mislead the public generally, who are purchasers of the article bearing the device, and make it pass with them for his article. Hence where, on ordinary observation, the labels used by two parties would not be apt to be distinguished the one from the other, the size, shape, vignette, coloring, and marking being so nearly identical as to make them easily pass for the same, and the only difference discernible on considerable scrutiny being in the name of the warrantor stamped upon them, in letters so small as not readily to attract attention, an injunction was granted." Cod. Trade-Marks, § 353; *Walton* v. *Crowley*, 3 Blatchf. 440. "The imitation of the original trade-mark need not be exact or perfect; it may be limited and partial. Nor is it requisite that the whole should be pirated." Cod. Trade-Marks, § 377; *Filly* v. *Fassett*, 44 Mo. 168. "A party will be restrained by injunction from using a label as a trade-mark resembling one used by another, in size, form, color, words, and symbols, though in many respects different, where it is apparent that the design was to depart from the genuine label sufficiently to constitute a difference when the two were compared, and yet not so much so that the difference would be detected by an ordinary purchaser unless his attention was particularly called to it, and he had a very perfect recollection of the other label. And in such a case it will be inferred that the design was to deceive, and to obtain in the manufacture and sale of an article any benefit or advantage that might be gained by its being purchased for another article of the same description which was known and distinguished by a particular trade-mark." Cod. Trade-Marks, § 378; *Lockwood* v. *Bostwick*, 2 Daly, 521. "Where the defendant puts up for sale his manufactured article with labels and wrappers which are a colorable imitation of those passed by plaintiff, * * * *e. g.*, where the color of the paper, the words used, and the general appearance of the labels show an evident design to give a representation of those used by the plaintiff, he will be enjoined from so doing, and the fact that he puts his own name on the wrappers, etc., as the manufacturer of the article, will not prevent it from being an infringe-

ment on plaintiff's trade-mark." Cod. Trade-Marks, § 392; *Lea* v. *Wolf*, 13 Abb. Pr. (N. S.) 389. "Where a person, by a combination of elements and symbols, has produced a wrapper to inclose and designate an article manufactured by him, under which it has gone into use, he cannot be interfered with or despoiled of his lawful business by the adoption of a label by another similar in color, size, border, ornamentation, symbol, and colored ink, and so closely an imitation that the careless or unobservant purchaser may be readily misled. Such practices are deceptive, and have their origin in and promote dishonorable competition. In order to justify the intervention of a court of equity, it is sufficient that the imitation is so close that a crafty vendor may palm off on the buyer the article manufactured by the latter as that of the former. It is no answer to an application for an injunction that in certain particulars the label of the defendant differs from that of the plaintiff, so long as the imitation in other respects is so close that the general appearance is the same, and purchasers have been and are likely to be deceived." Cod. Trade-Marks, § 497; *Brown* v. *Mercer*, 37 N. Y. Super. Ct. 265. Under these authorities, and many others which might be cited, we think that the plaintiffs were entitled to the injunction and to the other relief granted by the special term.

It is claimed that the plaintiffs were not entitled to such relief, because the name "Russian Caravan Tea," sought to be protected as part of their trademark, was intended to deceive the Russian inhabitants of this country. We are not able to concur in this view. It appears by the testimony that many years ago tea was imported from China into Russia on the backs of camels, and that the tea so imported became known in Russia as "Russian Caravan Tea." It appears, however, by the evidence of one of the plaintiffs, which was not contradicted, that of late years very little tea is imported from China into Russia in this manner, and that the term "Russian Caravan Tea" has become conventionalized, and does not signify tea imported into Russia from China by caravans, but a certain quality of tea which is grown in a certain district in China. As was well illustrated by the witness, the term "Russian Caravan Tea" no more indicates tea imported into Russia from China by caravans than does the term "English Breakfast Tea," as used in this country, indicate tea imported from England. In each case the term is used to denote a certain quality of tea; and the uncontradicted testimony in the case is that the tea put up by plaintiffs is superior in quality to that which is ordinarily known as "Russian Caravan Tea." The judgment should be affirmed, with costs. All concur.