## J. & W. TAYLOR vs. CARPENTER.

Where manufacturers adopt certain trade-marks, and stamp them upon articles manufactured by them, they have a right to an exclusive use of such trade-marks, and are entitled to the interposition of a court of equity to enforce such right by a perpetual injunction.

Any person who pirates the trade-marks of manufacturers may not only be restrained by injunction from using such trade-marks, but where he uses them for the fraudulent purpose of inducing the public to believe that the article to which such marks are affixed is the genuine article manufactured by those who first adopted the marks, and with the intention of supplanting them in the good will of their trade and business, he is also liable to respond for the damages sustained by them in consequence of such fraud.

And the fact that the simulated article is of equal quality and value with the genuine article, is no defence to a bill filed against the pirate, by the manufacturers of the genuine article, to restrain him from using their trade-marks.

Aliens have the same right to relief in a court of equity, against a piracy of their trade-marks, as citizens of the United States.

THE bill in this cause was filed for the purpose of obtaining a perpetual injunction, restraining the defendant from using the trade-marks of the complainants. The bill stated that the complainants, who resided in England, were engaged in manufacturing cotton sewing thread, and vending the same not only in England but in the United States, and particularly in the city and state of New-York; that their thread was put up for sale on spools, labelled on the top of the spool, "Taylor's Persian Thread," and on the bottom of the spool, "J. & W. Taylor, Liecester," each spool containing about 200 or 300 yards of

Taylor *v.* Carpenter.

thread; that the spools containing 200 yards were black, and labelled "200 yards," on the bottom of the spools, and those containing 300 yards were red, and labelled "300 yards," on the bottom of the spool; and that on the centre of the same label, on the bottom of each spool, was stamped the symbol or print of a lion rampant. The bill further stated, that by means of the care, skill, and fidelity with which the complainants had conducted the manufacture of such thread for many years, their thread had acquired a great reputation in the trade throughout the United States; and that large quantities were required and furnished by them for the consumption of the country, &c. The complainants further stated, in their bill, that the defendant, for the purpose of procuring the trade and custom of persons who had been in the habit of vending and using the complainants' thread, and of inducing such persons and the public to believe that the defendant's thread was in fact manufactured by the complainants, had engaged extensively in the manufacture of cotton sewing thread; that he had caused the same to be put up for sale, on spools similar to those used by the complainants, and so colored, stamped, and labelled, as exactly to resemble the spools used by them; that the spools and cotton sewing thread so prepared by the defendant for sale, and sold by him, was an exact imitation of the article manufactured and sold by the complainants; that the spurious article thus manufactured and sold by him, although inferior in quality to the genuine thread manufactured and sold by them, could only be distinguished therefrom by a careful examination of its quality, and by its falling short in the number of yards, and was well calculated to deceive dealers and purchasers; and that the same was a fraud and deception upon those who dealt in the thread, and who were induced to purchase the same, believing it to be the genuine article manufactured by the complainants. The complainants therefore prayed for a perpetual injunction, restraining the defendant and his agents from manufacturing and selling, or offering for sale, such simulated thread, under the name of Taylor's Persian Thread, or by an imitation of their labels or marks, &c.; and that the defendant might be decreed to account for the profits which had been made by the sale of such simula-

ted thread, or which the complainants would have made upon the sale of their genuine thread but for his inequitable and wilful piracy of their names, spools, and labels.    The defendant, by his answer, admitted all the material allegations in the bill; and particularly that he was and had been engaged in manufacturing and putting up for sale cotton sewing thread with the complainants' marks, and so colored, stamped, and labelled as to resemble exactly, or as nearly as the same could be done, the spools used by the complainant.    But he denied that the thread manufactured and sold by him was an inferior article, and insisted that it was as good, in all respects, as the thread of the complainants, and contained the same number of yards upon a spool.    The cause was heard upon bill and answer.

*M. Hoffman,* for the complainants.    The most ample protection is given to trade-marks, long used, which become notorious, and which give a reputation and character to the article. The cases are all collected in *Drewry on Inj.* 231 *et seq.*    The case of *Bell* v. *Locke*, (8 *Paige*, 75,) contains and adopts the English principle.    The simulation of the name and dress in that case, with a view to deceive the public into the belief that the papers were the same, would have been sufficient had such identity in fact existed.    The answer avers that the quality of the defendant's article is not inferior to that of the complainants. This fact is wholly immaterial.    The blacking in the case cited by Mr. Eden, (*Day* v. *Day, Eden on Inj.* 226,) may have been of equally good quality.    And in *Knott* v. *Morgan*, (2 *Keen*, 213,) cited in *Bell* v. *Locke*, the omnibus of the defendant may have been as commodious and as speedy as that of the complainant, and it may have served the public as well.    Whether it was so or not is no part of the case, and is entirely immaterial.    The wrong to the individual is palpable.    The deception upon the public is equally so.    The point of actual damage, or no damage, to the purchasers is not to be regarded.    The only question is, whether the great principle of American law between ourselves—the principle of common honesty and sound equity— shall be administered in behalf of a foreigner.

It appears difficult to imagine a reason why the foreigner should not be protected as well as the citizen. Certainly it is for the interest of trade, and for the interest of the citizens of the United States, that they should not be deceived in an article which has obtained and merited, and which they have a right to suppose will retain and merit its reputation; instead of being at the mercy of every forger, who when he succeeds by his forgery in driving the genuine article from the market may impose a very inferior one upon the public. Under the patent laws of the United States, the talent or skill of a foreigner is so far respected that a prior invention by him of the thing patented here will defeat the patent. (*Rutgers* v. *Kanowers,* 1 *Wash. C. C. R.* 168. *Mellus* v. *Silsbee,* 4 *Mason,* 108. *Whitney* v. *Carter, cited in Fessenden's Law of Patents,* 123.) The 10th section of the act of Congress of April, 1800, prescribes the mode in which a patent shall be repealed. I have not found any case upon this section, except that of *Perkins* v. *Odiorne,* (*Fessend. Law of Pat.* 175.) And the question, whether the repeal could be made upon the suggestion of a foreigner, has probably never been made the ground of judicial decision. The course in England appears to be to proceed by a scire facias; obtained upon a memorial of the aggrieved party, and on the fiat of the attorney general. (2 *Richardson's Pr. C. P.* 391.) The interest of trade, the comity of nations, and the protection of our own citizens, require that so palpable a fraud upon the rights of property should not to be permitted to pass unredressed.

*J. Blunt,* for the defendant. Property in things which we have created or improved by our own labor or skill, is generally recognized by the municipal law, but not always. And the title thus conferred is not invariably of the same quality or degree. Property in any physical or material article is as complete and as lasting as the object itself. It is not deemed so when the property is of an immaterial or intellectual character. The right to such property is not only of limited duration, but certain steps are necessary to be taken to secure the enjoyment of it during that period. The property in patents and in literary publications is

Taylor v. Carpenter.

of that character. And surely nothing of property of this description can have a more sacred character than that which a man has himself created; yet of such property an inventor or author is not entitled to the exclusive enjoyment, unless he conforms to the requisitions of the patent or copyright laws. And these only secure to him the right of property in his own country, and for a limited period. In foreign countries, any one may use the patent or infringe the copyright, and no redress is provided for the inventor or author. His right of property extends not beyond the jurisdiction of his country.

If such be the law and policy of this country as to property of the highest intellectual character, how can the complainants ask the interference of the court, to protect them in the exclusive enjoyment of the property which is the subject of this suit. Although it is of a similar character, it is so much inferior as not to be deemed worthy of protection under the laws provided for the enjoyment of patents and copyrights. All the cases cited in behalf of the complainants are between citizens of the same country, and are altogether inapplicable to a controversy between Englishmen and citizens of the United States.

The law of England does not protect the inventions of a citizen of the United States from being used by her majesty's subjects. And the annals of invention are full of the appropriation by Englishmen of machinery, invented by American genius, without acknowledgment or compensation. The comity of nations cannot be invoked, in behalf of an English subject. The whole commercial legislation of Great Britain is founded upon a principle of deep rooted hostility to the interests of other nations. Of all civilized powers, England has least to ask of other countries, in a commercial point of view, on account of the comity of nations. She has granted nothing to us, and she is entitled to ask nothing at our hands.

THE CHANCELLOR. The fact that the complainants are subjects of another government, and that the defendant is a citizen of the United States, as stated in the answer, cannot alter the rights of the parties, or deprive the complainants of the favora-

ble interposition of this court if those rights have been violated by the defendant. So far as the subject matter of this suit is concerned, there is no difference between citizens and aliens. And the only question proper to be considered is whether the defendant has the right, as he insists he has, to pirate the trade-marks of the complainants with impunity; and to palm off upon the community a simulated article, as the genuine Taylor's Persian Thread manufactured and put up for sale by them.

In the case of *Bell* v. *Locke*, (7 *Paige's Rep.* 75,) I had occasion to examine the question whether an injunction bill could be sustained for the fraudulent assumption of the name of the complainant's newspaper, for the purpose of deceiving the public and supplanting him in the good will of his business. And I then came to the conclusion that this court had jurisdiction to interfere for the protection of the complainant's rights in such a case. I there referred to the case of *Knott* v. *Morgan*, (2 *Keen's Rep.* 213,) where the present master of the rolls in England granted an injunction to restrain the defendant from running an omnibus having upon it the simulated names and devices which were previously in use by the complainant; which simulation was to induce the public to believe it was the complainant's omnibus, and to deprive the latter of a part of the good will of his business by this fraudulent device. Since the case of *Bell* v. *Locke* was before me, the case of *Millington* v. *Fox*, (3 *Myl. & Craig's Rep.* 338,) has been decided by Lord Cottenham. That decision fully sustains the claim made by the complainants in the present case. There the complainants for many years had been engaged in the manufacturing of steel, with a particular name or mark thereon indicating the persons by whom it was manufactured. The defendants, without being aware that this was the trade-mark of the complainants or of any individual, commenced the manufacture and sale of steel with the complainants' marks thereon. And a perpetual injunction was granted against the use of such marks; although the lord chancellor was satisfied that no fraud was intended. He says that having come to the conclusion that the complainants were entitled to the marks in question, they had an undoubted right to the assistance of a

Taylor v. Carpenter.

court of equity to enforce that title, by a perpetual injunction. But as the defendants had given notice of their intention to abandon the use of the marks, as soon as they discovered that they belonged to the complainants, they were not charged with costs. A case is also cited by Lord Henley, in his treatise upon injunctions, where a manufacturer of blacking was restrained from using labels in imitation of those used by the complainant, in that case. (*See also Ransome* v. *Burtall,* 3 *Law Jour.* 161.)

In the case under consideration, the defendant admits that he has intentionally pirated the complainants' name as well as their other marks; that he put up the spools of thread manufactured by him, and stamped and marked them with their marks; and that he so colored, stamped and labelled them as to resemble exactly, or as nearly as could be done, the spools used by the complainants. After such an avowal, no one can doubt for a moment that the defendant did this for the fraudulent purpose of inducing the public, or those who were dealing in the article, to believe that it was in fact the thread manufactured and put up by the complainants; with the intention of supplanting them in the good will of their trade and business. And it is wholly immaterial whether the simulated article, manufactured by the defendant, is or is not of equal goodness and value with the real "Taylor's Persian Thread," manufactured and put up for sale by the complainants. They are therefore entitled to the relief prayed for in this bill.

The injunction must be made perpetual, and the defendant must pay to the complainants their costs of this suit. If the complainants wish it, they may also have a reference to a master to ascertain and report the amount of their damages; and a decree that the defendant pay the amount of such damages, upon the coming in and confirmation of the master's report.(a)

(a) Affirmed upon appeal to the court for the correction of errors, December, 1846. And see the cases on this subject collected in notes to *Patridge* v. *Menck,* (2 *Barbour's Ch. Rep.* 101.)