JOSEPH GILLOTT *vs.* RICHARD ESTERBROOK and others.

47b    455
68 A.D¹139.

An injunction will be granted where the design of the defendant to defraud by manufacturing and packing an article, under a trade mark, in all respects similar to the plaintiff's, excepting only the use of the name, plainly appears. INGRAHAM, J. dissented.

The fact that the plaintiff has issued a notice or *"caution,"* to the public against the fraudulent use of his device, showing that he knew that others had used the same combination of numerals as his own, for the purpose of defrauding him, will not be deemed an acquiescence in the use by such others of the particular arrangement of numbers upon steel pens and packing boxes which the plaintiff had first adopted and used.

THIS action was brought to recover damages for an infringement of the plaintiff's trade mark as a manufacturer of steel pens, by the defendants; and the plaintiff prayed for an injunction restraining the defendants from using the trade marks in question. The action was tried on pleadings and proofs, at a special term in New York, before Justice POTTER, in November, 1864, by whom the following facts were found, viz :

"It is found by the court that the plaintiff is a manufac-

turer of steel pens in Birmingham, England, and has been such manufacturer since the year 1825, or before that time ; and for the last twenty years and upwards has had an agency in the city of New York for the sale of said steel pens in the United States to the trade, and at wholesale, to which agency they were consigned for sale. That the plaintiff so manufactured and sent to the United States steel pens of various descriptions ; and among them, as early as the year 1839, or before that time, a flexible, bronzed, double ground, extra fine pointed slip pen, with an oval opening in the upper part of the split—which pens were first sold on cards, and about the year 1842 were put up for sale in block paper boxes. That there was impressed upon the said pen the number "303," and the words "Joseph Gillott, Extra Fine." That said pen, so marked, became well known to the trade and dealers as a valuable and popular pen, and was in great demand, and the most prominent pen in the market, producing large sales, at prices from twenty-five to one hundred per cent higher than the pens made in imitation thereof, or of other pens with the same mark or number "303." That it was known and ordered by stationers and other dealers by its said number 303, to distinguish it from other pens made by the plaintiff of other patterns and descriptions. That said number, "303," was impressed on said pen by the plaintiff before it had been so used by others, and was so selected and impressed to distinguish such pattern or character of pen from other patterns made by him, and was so adopted and used by the plaintiff as his trade mark for said pen, in connection with his name and the words "extra fine." That said figures 303 were arbitrarily selected by the plaintiff, and of themselves expressed no quality or size of the pen ; and no other pen was then known which had said numerals impressed thereon. That since about the year 1842 said pens have been put up in said boxes, holding one gross each ; the boxes being covered with ornamental figured paper with a label lengthwise of the box, extending over the top and ends of the box, of different

colored fancy paper, with an ornamental border thereon, on which is printed the words, "these pens are manufactured under Joseph Gillott's own superintendence." On the top of the box, in the centre of the label, is the plaintiff's name, in larger letters than the other print on the label. Above the name is "No." (meaning "number,") and below the name in large and conspicuous type are the numerals "303." On the bottom of the box is the word "Caution"—the terms of the caution, which are in fine print, being as follows: "J. G. regrets to say certain disreputable makers have tried to impose upon the public a spurious article, bearing the mis-spelled name of the patentee and sole manufacturer, thus, 'Gilott' or 'Gillot,' so as to retain the sound. Please to observe all the genuine pens are marked in full 'Joseph Gillott,' and every packet bears a fac simile of his signature thus, Josʰ Gillott." And I further find that the defendants, except the said Richard Esterbrook, Jr. under the name of R. Esterbrook & Co. are manufacturers of steel pens, at Camden, New Jersey, where they commenced the business four or five years ago—and the defendant, Richard Esterbrook, Jr. is and has been their agent for selling the same in the city of New York. That the defendants manufacture and sell a pen which in size, shape, color, pattern, flexibility, and fineness of point so closely resembles the said pen of the plaintiff as to require an expert or adept to distinguish them in these respects. That said defendants have also impressed upon their said pen, in the same place as upon the plaintiff's said pen, the said numerals "303," and the name of the defendants' firm, "Esterbrook & Co." and the same words "Extra Fine," as upon the said pen of the plaintiff. That the defendants also put up their said pens in paper boxes of the same size, and covered with ornamental paper similar to that upon the plaintiff's boxes, with a fancy paper label also similar to that on the plaintiff's, extending around the box lengthwise and to about the same extent, and with the same words printed on the label as on the plaintiff's, except

the name, which is "Esterbrook & Co." instead of "Joseph Gillott." Above the name on the label, in like manner as on the plaintiff's, is the word "No." and below the name, equally or more conspicuous than on the plaintiff's, are the numerals "303." On the bottom of the box there is also the word "caution," the language of which is as follows : "These pens are of genuine American manufacture, and equal in finish, elasticity, and fineness of point to the best imported.; they are therefore sure to gain the confidence of the American public. The fac simile of our signature is sufficient security against foreign imitation, R. Esterbrook & Co." That said use by the defendants of said numerals "303," was with a knowledge by them of the rights of the plaintiff to the same, and with the intent to obtain for themselves the profits and advantages to which the plaintiff was exclusively entitled in the use of his said trade mark ; and to mislead the public and defraud the plaintiff in that respect. I further find that after said trade mark had been adopted in manner aforesaid by the plaintiff, and the same had become established and well known as his trade mark for said pen, and said pen as made and sold by him had become popular and was in great demand, stationers and others in the city of New York, for fifteen years past, or more, have advertised and sold pens similar in appearance, as "303, extra fine pens," and as "manufactured under their own superintendence," when in truth they had never manufactured or superintended the manufacture of a pen, but had procured said pens to be manufactured for them by English manufacturing houses in Birmingham, or by the defendants in this country, pursuant to orders sent by them as to pattern, device, and marks, and that said orders were prompted by the demand of the market, which dictated the selection of the most popular character of pen—which pens so ordered were chiefly the "303, extra fine," made in almost exact imitation of the plaintiff's said pen, and put up in the same manner, with the same accompanying devices. That the plaintiff had no knowledge of said practice, and did

Gillott *v.* Esterbrook.

.not authorize or acquiesce in the same. I further find, as matter of law, that the plaintiff, by the adoption and continued use of said numerals "303" on said pen as his trade mark, in manner aforesaid, became entitled to the exclusive use thereof, and to the profits and advantages to be derived therefrom, and that he is entitled to a perpetual injunction restraining the defendants from infringing said trade mark, and from the use thereof, and from making or selling pens with said numerals impressed thereon, or impressed on the box or package containing the same. And that the defendants, by their unlawful use thereof, in manner aforesaid, have infringed the said rights of the plaintiff, and are liable to him for the damages he has thereby sustained, and the gains and profits he has thereby lost and been deprived of."

It was therefore ordered and adjudged that the said defendants, Richard Esterbrook, Richard Esterbrook, Jr. Joel Cadbury, Jr. and James Bromsgrove, and each of them, their agents and servants, do absolutely and perpetually desist and refrain from infringing or using the said trade mark of the plaintiff, and from making or selling pens with said numerals "303" impressed thereon, or impressed on the boxes or packages containing steel pens. And it was further ordered that the defendants pay to the plaintiff the costs of this suit.

The following opinion was delivered by the justice, at special term.

POTTER, J. "The facts established by the evidence show that the plaintiff is a manufacturer of steel pens at Birmingham, England. That he commenced the manufacture of pens as far back as the year 1825, and has an agency at 91 John street, New York, where his pens are consigned to his agent, and where he sells to the trade and others at wholesale and retail to a large amount. Among the varieties of pens made by the plaintiff is a flexible, bronzed, double ground, extra fine pointed slip pen, with an oval opening in the upper part of the split. It is not quite certain when this character of pen was first made by plaintiff, but it is certain it was as

early as the year 1839. At that time they were introduced on cards of one dozen each, with holders, but about the year 1842 they were put up in what are called block paper boxes, containing each twelve dozen, called one gross. The marks by which this particular pen is distinguished upon the pen itself are as follows:

These marks are impressed upon the pen. This pen has become well known to the trade dealers as a popular and valuable pen, was in great demand, and was the most prominent pen to be found in the market, producing large sales, and selling from twenty-five to one hundred per cent above the imitations of it. It was known and ordered by stationers and other dealers by its number, 303, to distinguish it from other pens made by the plaintiff of other patterns, numbers, and varieties of flexibility and point.

It is satisfactorily established by the evidence that the plaintiff first adopted the marks that are impressed upon this pen before they or any other of them had been used by others; and that such marks altogether, at the time of their selection, were made to distinguish this pattern or character of this pen from other patterns made by him. The numerals 303 thereon were arbitrarily selected by plaintiff as other trade marks are selected, and of themselves express no quality or size of the pen; and at the time this pen was introduced no other pen was known having those numerals stamped upon it. The plaintiff had no letters patent for this pen. The plaintiff's pen in question, since 1842, has been put up in boxes of a size just sufficient to contain one gross. The boxes were covered with ornamental figured paper. Lengthwise of the box, and partly under the bottom, is a label of different colored fancy paper with an ornamental border on the label, upon which is printed these words, "these pens are manufactured under Joseph Gillott's own superintendence." On the top of the box, in the centre of the label, is the plaintiff's

Gillott *v.* Esterbrook.

name in larger letters than the other print ; on the label above the name is the word No. (abbreviation for number,) and below the name, in large and conspicuous type, are the numerals 303. Upon the bottom of the box is the word *"caution."* The terms of the caution are in fine print, to the purport that disreputable persons have tried to impose upon the public a spurious pen under a mis-spelled name, Gillotte, to which is added a fac simile of the defendant's signature, "Jos. Gillott." The plaintiff claims protection not only in the marks impressed upon the pen but also in the exclusive use of this box with its fancy covering, label, name, number, numerals and "caution" in their combination as a part of his trade marks.

The defendants, under the name and style of R. Esterbrook & Co. are manufacturers of steel pens at Camden, New Jersey, where they commenced the manufacture four or five years ago. They manufacture also a pen in shape, color, size, pattern, flexibility and fineness of point so closely resembling the pen of the plaintiff above described, as to require an adept or expert to distinguish them in those respects. The defendants have also impressed upon their pen in the same place as upon the plaintiff's pen the numeral "303," and also the name of the defendants' firm, "Esterbrook & Co.'s," and below the name of the firm also the same words, "extra fine," that are upon the plaintiff's pen. They also put up their said pens in paper boxes of the same size, and covered with ornamental paper similar to that upon the plaintiff's boxes, and with a fancy paper label, also similar to that on the plaintiff's, which also extends round the box lengthwise and to about the same extent, with the same words printed on the label as is on the plaintiff's, except the name, which is "Esterbrook & Co.'s," instead of Joseph Gillott. Above the name on the label, in like manner as on the plaintiff's, is the word No. and below the name, equally so as on the plaintiff's, or still more conspicuously, are the numerals 303. On the bottom of the box is also the word *"caution,"* but the

language of the caution is different in its purport, and states that the *fac simile* of their signature is sufficient security against foreign imitation.    This is signed "Esterbrook & Co." These are the leading features of the case, but some other facts will be referred to in the discussion.    The plaintiff claims that the defendants should be enjoined from the marks which are upon either the plaintiff's pen or boxes—as a gross interference with his rights.    The law in relation to trade marks, in late years, has been much discussed in our courts, still however, leaving many questions unsettled, so that what is proper to be done in cases of this kind depends more or less upon the circumstances that attend them.    The questions presented in the adjudicated cases have been variant in their features, and partially so conflicting that we are compelled to look at a few general principles that seem to be settled, and then resort to analogies, in order to determine from them what should be held in the particular case, and then deal with it according to the nature of its peculiar circumstances.

1st.  It seems to be settled in equity that every man has a right to his own labor, and has a right to select a device or symbol by which to designate his goods and manufactures, so that they may be distinguished from those of others, and so that persons desiring to trade with or deal in that kind of commodity may be able to recognize it as his, and that he may thus secure the profits which their superior repute as his may be the means of gaining.    The device so selected is called a trade mark, and a court of equity will exercise its power to protect the owner of such trade mark in the exclusive enjoyment thereof when so chosen.    The principle, in short, is this, that no man has a right to sell his own goods as the goods of another, and the courts will lend their aid to prevent the imposition ; but there is a limitation to this right.    The trade mark which is entitled to protection must be such as will identify the article to which it is affixed as that of the person adopting it, and distinguish it from others.    The principle above laid down and its limitation is

so fully discussed by Duer, J. in the case of *The Amoskeag Manufacturing Co.* v. *Spear*, (2 *Sandf.* 599,) that little can be added in that particular. I regard this case as approaching more nearly in its features to that than any other, and so far as that similarity extends, that case is controlling. The case of *Stokes* v. *Landgraff*, (17 *Barb.* 608,) is to the same effect. The right to this benefit of the property in a trade mark, and of protection by the courts, depends also upon the priority of the selection or appropriation of the device, symbol or mark which is to distinguish the article manufactured, and the wrongs for which the courts in such cases will furnish a remedy consists in the act by others of misrepresenting to the public by the use of the same mark, the goods or wares of such other persons as having been manufactured by the true proprietor of that mark, and thereby depriving him, to a greater or less extent, of the benefit of the good will of his establishment, and the reputation he may have secured for his articles. (*Stokes* v. *Landgraff, supra,* 609. *Taylor* v. *Carpenter,* 11 *Paige,* 292.)

2d. A word that is well known in the language, and which is the name of an article, or words that merely indicate the quality of an article, can not, it seems, be so exclusively appropriated as a trade mark. Nor can the appropriated *name* of a manufactured article, if the article is a known substance or production, be exclusively used as a trade mark, except to those who have an exclusive property in the article itself ; though a mere name may be protected as a trade mark where it is used merely to indicate the true origin or ownership of the article offered for sale, or where a new preparation or compound is made, and a distinctive and specific name is necessarily given to it which has not before by adoption and use become known. (*Fetridge* v. *Wells*, 4 *Abb.* 144. 2 *Sandf.* 599. 17 *Barb.* 608. *Wolfe* v. *Goulard*, 18 *How. Pr.* 64, 67.)

The proper application of the principles of law contained in these two divisions or heads, collected from the cases cited,

will be sufficient, when adapted to the facts, to determine the case before me. It is quite clear to me that the plaintiff is not entitled to all the relief he claims. He asks, as we have seen, to be protected separately and in combination in the exclusive use of the box in which his pens are put up, with its fancy paper covering, not only, but in its fancy label, and the words printed thereon, with the word "caution" upon the bottom, and the words of the caution all in combination. The evidence does not sustain the plaintiff's claim in being first in priority of time in the manufacture of the boxes, or in selecting the fancy colored paper with which the boxes or their labels are covered, or in directing the size of the box. The plaintiff does not manufacture boxes. On the contrary, the manufacture of boxes is shown to be a distinct trade or occupation, carried on by other parties, who doubtless have a right to supply orders and furnish boxes of any size, pattern, or covering, not to one person only, but to all persons. Besides, if such a claim could be sustained by any one, the original manufacturers of boxes ought to have the priority of right to the trade mark on their boxes, and as an invention or device of their own, useful in the putting up of pens, and claim that no pen manufacturer should use boxes in imitation of his. The manufacturer of boxes would have as good a natural right to claim that all pens put up in boxes should be put up in his design of boxes as the pen manufacturer has to claim the benefits of that form of box which he has selected for its size, shape, or covering.

There is the same reason for excluding an article or thing in common use from becoming a trade mark as there is of words—and this reasoning also applies to the labels, which are printed to order, and of any particular fancy of colors and of lettering, and to the "caution" on the bottom. These labels and cautions (except the names of the parties) are composed of words in common use in our language, which, as we have shown above, can not be exclusively appropriated as trade marks. True, this selection of boxes, sizes, colors,

Gillott *v.* Esterbrook.

labels, cautions, and style of lettering, may all be designed to aid in the perpetration of a fraud, and may be the most conclusive evidence of the intent to mislead and deceive the public and to commit a fraud upon the plaintiff in relation to some device of his connected with a trade mark ; yet merely because they are such evidence, or because they have been used with such intent, it does not follow that their use can be legally enjoined and restrained.

It is where the person designing to practice a fraud by pirating a trade mark uses these evidences so connected with the trade mark itself as to effect a fraud, that he can be reached by the powers of the court. True, also, it is, that it is the right of the plaintiff to be protected against frauds, yet the fraud must be one in relation to a substantial legal right of the party, and protection will not, in all cases, be extended to the mere evidences of fraud alone ; and the courts are bound to be especially cautious that in the exercise of the power to restrain injustice they do not encroach upon the public interest by giving an improper check to a worthy and laudable spirit of enterprise, emulation and competition, in any department of business. It must be admitted that every citizen has the right, if he will, to manufacture and to sell steel pens honestly and fairly ; he has the right to the use of his own name, and where there is no patent to be interfered with, he may make his pens of any pattern, shape, color, size, state of flexibility, or fineness of point ; he may sell them singly or in quantities, on cards or in boxes of large or small size, and with such ornamentation as fancy or interest may dictate ; he may imitate any pattern or quality of pen, even if known to be made by any other manufacturer ; he may, if he can, make a superior article in material, pattern or quality, and if he can do so, he has the right to select a device, or symbol, as a trade mark to designate his manufacture from others ; and if such device or symbol relates to the origin or ownership of the goods to which they are affixed,

his legal right to protection is undoubted ; such protection is no restraint upon the freest exercise of talent, enterprise and competition in trade, but rather a proper stimulant to encourage competition ; his superior skill and enterprise gives him the right to its profits and advantages, and this is giving no encouragement to monopolies so destructive to the freedom of trade. It may be that in this case the defendant's pen, in fact, is equal in merit, or even superior to the plaintiff's ; this was not an issue in the case—the merit of the defendant's pen was not in question, further than what may be the legal inference or presumptien.

Again, applying the principles above laid down to the case on trial, I see no legal reason why the defendants may not print upon the labels which pass lengthwise nearly around the boxes in which their pens are put up, the superscription "These pens are manufactured under R. Esterbrook & Co.'s own superintendence," notwithstanding this language, (except the name of the manufacturer) is the same as that employed by the plaintiff upon his labels, and is in close imitation thereof in the size, color and form of the label. It would otherwise create a monopoly not only in the sale of a particular kind of manufacture, more potent than a patent would confer, but a monopoly in the use of words in our language by one man against the rest of the world, which public policy would not tolerate. The words on the defendants' label are ethically and literally true, and their use ought not therefore to be enjoined. These remarks apply equally to the caution on the bottom of the box. The words employed in both these respect by the defendants are as truthful in their application to his pen as those employed by the plaintiff to his, and it would be as unbecoming as it would be unjust for a court of equity to restrain the publication of a truth. There is another portion of the plaintiff's designation of this pen which it appears to me is not subject to the rules we have last been discussing. This is the plaintiff's selection and adoption of the numerals 303, which, together with his name,

are impressed upon his pen. These symbols or figures do not of themselves indicate any appropriate name of this pen, nor any mode or process by which it is manufactured. They do not indicate the quality of the pen—but, connected as they are with the plaintiff's name, they indicate the origin and ownership of the pen, and were intended by him, with the addition of the words "extra fine," impressed thereon, also to designate the pattern of this pen as distinguished from other pens of his manufacture represented by other numerals, and also to distinguish it as the pen of his manufacture by those peculiar marks or devices. The marks last named, except perhaps the words "extra fine," seems to be within the rule that allows a device to become a trade mark. The impression of these same numerals on the *defendants'* pen indicates no quality of their pen, and as they are not claimed by the defendants to be their trade mark by a prior adoption, no good, legal or honest reason is shown by them for their selection, adoption, or use. When the defendants commenced manufacturing their pen, there was in the market a well known, valuable, popular pen known to all the dealers and stationers as " Gillott's 303 extra fine pen ;" it was the oldest, most noted, most valuable and most patronized pen in the market. It was so well known and noted that it was ordered by its numerals or number 303 by those in the trade —the 303 pen was an established article. Though the imitations of it by others are numerous, the value of the plaintiff's pen, taking price as the test of value, is far above all others—the object of imitation seemed to be to equal the 303 pen. If these numerals are a trade mark of the plaintiff's, if he was the first person who employed them to indicate the true ownership and manufacture of this pen, as we find the facts to be, the selection by others of this same trade mark, in whole or in part, has a direct tendency to defeat the object and advantage of its selection, and to deprive the plaintiff of the profits which might otherwise arise from his enterprise and skill in furnishing a superior article of manufacture. It

is but the dictate of common sense to say that it is only a *superior* article that is ever attempted to be imitated ; there can be no object to imitate a common or an inferior article.

If the imitator by his skill can make or has made an article to sell superior to that of any prior manufacturer, instead of an ambition to be only equal, his aspiration would be to obtain the reputation and secure the profits of his own superior skill and enterprise by a trade mark of his own ; in other words, the appropriating of the trade mark of another is the tacit admission that the simulated article is inferior. It necessarily follows as a logical deduction from these facts, that the simulation of this pen by the defendants proceeded from the hope of gain to result to themselves by the use of the device " 303 " and the words " extra fine," so selected by the plaintiff as symbols and terms by which his valuable and popular pen was notoriously distinguished among all dealers in the trade ; this must have been done by the defendants in the expectation that the more unwary of purchasers would be thereby misled.    It is too remote a probability to suppose that the defendants, by any accidental choice of a trade mark to distinguish their pen, just happened to select the figures 303 for that purpose ; indeed this is not set up or claimed by them : any other set of numerals or any other device or symbols will represent the defendants' pen just as well as "303," unless the design is to defraud the plaintiff.    It is no hardship upon the defendants to have them stand upon the merits of their own pen unaided by the reputation of the plaintiff as a manufacturer, or by the merits of his pen.   If the defendants' pen is superior to the plaintiff's it will become popular upon its own merits ; if it is inferior to the plaintiff's the public should not be misled or defrauded by the use of his trade mark by others.

It is true that the imitation is but partial—and though there is in the imitation a mingling in part of words adopted by the plaintiff as a trade mark, which the law does not protect, with the devices which are by law protected, and though

it may be that the pattern, size, color, and flexibility of the defendants' pen and the boxes in which they are put up, as well as the labels and cautions, are all ingenious imitations designed to accomplish the same improper object, to wit, gain to the defendants to the injury of the plaintiff's reputation as a manufacturer, and loss of his profits, I am unable to see upon authority that the inhibition which this court can grant can be made to go beyond that of restraining the defendants from the use of the numerals "303" impressed upon their pens and printed upon the labels of the boxes in which their pens are put up.   The defendants' pen may be "extra fine," and if so, they have a right to call them so.   All manufacturers have the right to make extra fine pens, and to advertise this quality any where upon the pens, upon the labels, or in publications elsewhere, but they must advertise them as their own; so far as they have done this under their own name they are to be tolerated—but it appears to me that it would be no more deceptive or fraudulent to use the plaintiff's name than it is to use his lawful trade mark by which his manufacture is known ; the one perhaps as much as the other is connected with his reputation as a manufacturer, and the cause of his gains.   It is not necessary for the plaintiff, in order to receive the protection of this court, that he show that his whole trade mark has been pirated or simulated.   A false impression can as well be conveyed to the mind of the public, and especially to the unwary, by a partial as by a total counterfeit.

The design to defraud may be as apparent and is generally more injurious in the partial than in the entire imitation. Where the trade mark is a conspicuous device connected with the name of the true proprietor, of course the imitator would desire to avoid the offense of forgery, and would omit on his own article the name of the true proprietor and substitute his own ; but the real device might be copied with the imitator's name and other words of the original added which

may be also true as regards the imitator's article, and yet as effectually mislead the public as in any other way.

It was offered as a part of the defense that a very large number of stationers, as well as other manufacturers than the defendants, have for years been engaged in vending and manufacturing pens similar to the plaintiff's, impressed in like manner with the figures "303" *and "extra fine,"* put up in boxes similar in size, ornamentation, label and caution, except only in the name of the manufacturer. That stationers in New York, for fifteen years or more, have been advertising and selling similar pens as " 303, *extra fine pens," " Manufactured under their own superintendence,"* and who have never manufactured a pen, or superintended its manufacture, who during all that time have had all their pens manufactured by English manufacturing houses in Birmingham, or by the defendants in this country, according to all orders sent by the dealers as to pattern, device and marks ; that such orders were governed by the demand of the market which dictated the selection of the most popular character of pen, and chiefly the "303" "extra fine," made in almost exact imitation of the plaintiff's pen, and put up in the same manner with the same accompanying devices. There was, however, no evidence of the plaintiff's actual knowledge of this practice. The legal effect of this evidence is : 1st. That it is no defense that the fraud has been multiplied. 2d. That acquiescence can not be inferred, and it is revocable if it could be. The moral effect is a perverted and corrupted state of commercial integrity and honor in this respect which can not too soon be exposed and corrected. When frauds are openly and publicly known, tolerated, encouraged and made common ; when unrighteous gain is regarded in a community as being above honor and integrity ; when prosperous overreaching and imposition passes for laudable enterprise ; public expose becomes an imperative duty by all engaged in the administration of the laws.

I do not intend, as far as my official duties are concerned,

that the Court of Equity shall bear the reproach of passively tolerating, or even of failing to expose, such a corrupted state of public sentiment in regard to the rights of persons coming before it, especially when the exposure is directly connected with a legitimate claim for protection to honest enterprise and skill.

It appearing to me from the evidence that the plaintiff, at a time prior to that of its use by any other manufacturer, selected the device "303" as a trade mark for a pattern of a pen manufactured by him; that he obtained and secured thereby a valuable interest in the good will of his manufacture of that pen; that having appropriated to himself this device to be engraven or impressed upon his said pen as a trade mark, which in connection with his name also impressed on said pen, indicated that such pen was manufactured and sold by him; the plaintiff has established a right, and is entitled to protection by perpetual injunction against the defendants' impressing or otherwise using the figures or numerals "303" (which is a part of the plaintiff's trade mark) upon their pens, or upon the labels or boxes in which the said pens are put up by the defendants."

The defendants excepted to the findings "that the plaintiff, by the adoption and continued use of said numerals 303 on said pen as his trade mark, in manner aforesaid, became entitled to the exclusive use thereof and to the profits and advantages to be derived therefrom; and that he is entitled to a perpetual injunction restraining the defendants from infringing said trade mark, and from the use thereof, and from making or selling pens with said numerals impressed thereon, or impressed on the box or package containing the same." Also to the findings "that the defendants, by their unlawful use thereof, in manner aforesaid, have infringed the rights of the plaintiff, and are liable to the damages he has thereby sustained, and the gains and profits he has thereby lost and been deprived of." Also to the decision of the court wherein and whereby it is "ordered and adjudged that the

said defendants Richard Esterbrook, Richard Esterbrook, Jr.
Joel Cadbury, Jr. and James Bromsgrove, and each of them,
their agents and servants, do absolutely and perpetually
desist and refrain from infringing or using the said trade
mark of the plaintiff, and from making or selling pens with
said numerals 303 impressed thereon, or impressed on the
boxes or packages containing steel pens." Also to the
decision of the court by which it is "ordered that the defend-
ants pay to the plaintiff the costs of this suit."

And the defendants appealed from the whole of the judg-
ment, to the general term.

*Wm. A. Coursen,* for the appellants. I. The court erred
in not granting the defendants' motion to dismiss the com-
plaint. There was no evidence that the plaintiff did first
adopt the use of the figures "303" as a trade mark, or for
any other purpose.

II. If it should be admitted that the plaintiff first adopted
the use of the figures "303" to imprint the same on boxes or
impress them upon steel pens, yet the plaintiff never could
and can not appropriate to himself for a trade mark, or other-
wise, the exclusive use of any *words* or *figures* which have no
relation to the origin or ownership of the goods impressed, but
are only meant to indicate their name or quality. In this
connection, we contend that the use of the figures "303" was
intended by the plaintiff himself, upon the first use of them
by him, to designate only a pen of peculiar *fineness of point,*
and that, undoubtedly, long before the defendants commenced
the manufacture of steel pens, dealers in and manufacturers
of steel pens understood and universally agreed that the fig-
ures "303" impressed upon steel pens indicated *solely* that
the pens were of a peculiarly *fine point.* The testimony on
this point is overwhelmingly in favor of the position contended
for by the defendants ; and, really, the testimony is almost
(if not quite) all one way. As to the law governing this and
similar cases, we refer the court to *Corwin* v. *Daly,* (7 *Bos.*

222 ;) *Stokes* v. *Landgraff*, (17 *Barb.* 608 ;) *Amoskeag Man. Co.* v. *Spear*, (2 *Sandf.* 599.)

Judge Potter, in his opinion, says (writing of *Amoskeag Man. Co.* v. *Spear*) : "I regard *this* case as approaching more nearly in its features to *that* than any other, and, so far as that similarity extends, that case is controlling." We cheerfully agree with Judge Potter in his opinion, and are much disappointed that his decision in this action is so completely at variance with his own opinion. In the case mentioned there was no question as to the prior adoption by the Amoskeag Man. Co. of the letters " A. C. A." to indicate that goods of some sort, so marked, were manufactured by that company ; but the testimony and the order of the court in that case show that the letters, as used, suggested only *the quality* of the goods. In fact, it was admitted that the final letter " A." *alone* signified that the goods marked with the three letters were the best quality of goods manufactured by the plaintiff in that case. In the action now before the court it may be contended that there is a dispute as to the meaning or intention of the plaintiff in the use of the figures " 303." However, the testimony of his own witnesses, and of all the witnesses of the defense, is decidedly clear and invariable to the effect that those figures are used to indicate the *fineness of point* (or quality) of the pens upon which the figures may be impressed. If there does exist any difference between the two cases, then this case is even stronger, in the position assumed by the justice in the Amoskeag Co. case, than was that case itself. In this action, not only is the proof of the real use and intention of the figures " 303" practically invariable, but there is the further uncontroverted testimony that the plaintiff made use, at the same time, of various figures or numbers, impressed upon his pens, and in every instance of such use of numbers or figures by the plaintiff he clearly intended to, and did, designate pens of a specific quality as to size, shape or point. The case of *Stokes* v. *Landgraff* contains, in brief, the same law as enunciated in the case

above cited, and this latter case has the additional strength of an affirmance of the judgment at the general term of the Supreme Court.

III. The figures "303" do not indicate or in any manner suggest to dealers that the pens, with those figures impressed upon them, are the pens of any particular manufacturer. The figures are as definitely applied to and do designate only the fineness of point of the pens (irrespective of the manufacturer,) as do the numbers or figures upon shot-bags designate only the size of the shot in the bags.

IV. There is no pretense on the part of the plaintiff that the figures "303" denote, in themselves, any proprietorship, in the plaintiff, of those figures, or of the pens upon which the figures may be imprinted. Even the assumption (on the part of the plaintiff) that the figures indicate the "pattern" of the pen not only does not strengthen the plaintiff's case, but the assumption is not founded in fact, because : 1. "Pattern" is certainly *a quality* of a pen, and not only of Gillott's pens, but of the pens of all manufacturers, and unless the peculiar "pattern" of the pens with "303" impressed on them can be claimed exclusively by Gillott, his assumption that those figures only denote the "pattern" of the pen is of no service to him. There is no claim or pretense of claim on behalf of the plaintiff to any patent for, or to an exclusive right to the use of the alleged "pattern," and the findings of the court in the case are directly at variance with any such claim did it exist. 2. The figures "303," even as applied to the plaintiff's pens can not be deemed to denote exclusively any peculiar "pattern." The plaintiff (by Owen his agent) says that the "pattern" of the pens marked "303" is similar to that of the pens (of the plaintiff) marked "404." The testimony, though it does not all apply specifically to Gillott's pens, serves to show that the difference in pens, with various figures (or numbers) impressed upon them, consists almost entirely in the variety of *points*, and not in shape or "pattern."

V. The court will not interfere in cases where ordinary

attention will enable the purchaser to ascertain whether the goods purchased are pretended to have been manufactured by one or another manufacturer. In the case before the court, no one, except from utter (and it may be said) willful carelessness, could fail to understand that the pens of the defendants, when purchased, are expressly and very obviously declared to be manufactured by the defendants, and not by any other person. The declaration printed on the box, that the pens are manufactured by R. Esterbrook & Co., and the caution on the bottom of the boxes, should and (beyond any reasonable doubt) would arrest the attention of every purchaser. The questions as to the use of the boxes covered with colored paper, the labels running lengthwise around the boxes, the engraving and style of the labels, the words "extra fine," and the general use of a "caution," are all decided *in this case* in favor of the defendants ; and, with the explicit assertion upon the boxes (and upon each pen), that the defendants manufacture their own pens, we do not perceive the least room for hesitating to afford the defendants full credit to their denial of any intention to sell their pens as being the pens of the plaintiff. The defendants not only disavow any desire or intent to acquire profit on the reputation of the plaintiff, but, on the contrary, the wish and hope of the defendants are to establish a reputation of their own for the pens manufactured by themselves. (*See Partridge* v. *Menck, 2 Barb. Ch.* 101, *affirmed in Court of Appeals.*)

VI. Could we overlook all the proof as to the use of the figures " 303" and the intent of the manufacturer and the understanding of dealers in pens, that the said figures indicate only pens of a peculiar *fineness* of *point,* and if the court should go further and find that the plaintiff did originate the use of the said figures or numerals, and did and does apply the same to the identification, in some way, of himself as man ufacturer of the pens, even yet we should contend that the plaintiff had not, at the commencement of this action, any

rights in the premises which could be legally enforced against the defendants, because :

The use of the figures "303" upon pens manufactured by others than the plaintiff, was commenced and had continued in general practice for more than twenty years before the defendants commenced the manufacture of steel pens. This use of the figures was general, and generally known. It existed to the greatest extent at Birmingham, England, where the plaintiff for more than twenty years has had his manufactory. Hundreds of thousunds of pens with the same figures "303" impressed upon them, and of the same pattern or style as the plaintiff's, have been annually, for more than twenty years past, manufactured in Birmingham, right under the eyes and with the personal knowledge of the plaintiff. We do not forget that Judge Potter finds "that the plaintiff had *no knowledge of said practice,* and did not authorize or acquiesce in the same." This finding embraces the alleged ignorance of the plaintiff in regard to the manufacture of pens by other manufacturers, with "303" impressed upon them for the time above mentioned. We may, however, here be permitted to express our wonder at *that* finding of the learned justice who had before him, and had heard read, the notice published by the plaintiff for more than twenty successive years. By this notice the court will observe that the plaintiff, for more than twenty years, gave a caution to the public, which was "deemed necessary in consequence of other makers adopting the above designating number, by which the original Joseph Gillott's Victoria pen is better known than by any other term." This notice is exclusively respecting the pen marked by the number "303."

VII. It is indisputable that steel pens with the figures "303" impressed upon them had been manufactured by various manufacturers at Birmingham, England, and sold by dealers in most parts of Europe, and of the United States, for a score of years before the defendants commenced their manufacture in this country. The defendants, when they

started their business, found the public using large quantities of steel pens of various styles, sizes and patterns, and among other kinds of pens they readily perceived that an *extra fine pointed* pen, known as a "303" pen, was in great demand. That kind of pen was universally known in the market, and was so known not as the pen of Joseph Gillott, the plaintiff, or of any particular manufacturer.

There were pens with the figures "303" impressed thereon, manufactured and sold by Harrison & Bradford, M. L. Leman, and several others.

The public was informed that the pens were "303" of the manufacture of the above respective names or firms.   These pens were all manufactured and impressed with the figures "303" at Birmingham, England, except those manufactured by Harrison & Bradford.   It would have puzzled the defendants to decide whose pens they were imitating, or whose figures they were adopting, if by the use of the style and of the figures of the "303" pens they had in view the imitation of the style of pen or the adoption of the figures of any other manufacturer.   But, in fact, the defendants are no more chargeable with an intent or attempt to imitate the plaintiff's pens or adopt *his* figures by the manufacture and sale of the defendants' "303" pens than would be any manufacturer of spool cotton, or of thread, or of needles, who should now commence the manufacture of any of those articles, and impress upon the spools or the papers holding or covering the articles, the *appropriate designating numbers,* thereby informing the public of the quality, fineness, peculiarity of texture, or size of the spool cotton, thread or needles.

VIII. The cause of public morals appears to have been assumed by the court to be involved in this action.   If *that cause* be at all interested, it is clear that it will be much better subserved by the defendants' manufacturing and selling steel pens under and with their own signature, authority and open assertion of proprietorship than by having pens manu-

factured by the neighbors of the plaintiff, or by the plaintiff in England, and sold here as having been manufactured by the defendants. It can not be disputed that the defendants would have no difficulty, and would meet with no opposition from the plaintiff, in obtaining from the manufacturers at Birmingham, England, any desired quantity of steel pens with the figures "303" impressed on the pens and the pen boxes. We may here call the attention of the court to the testimony of the plaintiff's agent, by which it appears the plaintiff has suffered no damage by any act of the defendants connected with the manufacture of steel pens. That testimony, in connection with the significant omission of the court (at special term) to find that the plaintiff is entitled to recover in this action any amount for damages, contributes some strength to the defendants' claim for not only immunity but the negative protection of this court in their manufacture of steel pens in this country.

*Gilbert Dean,* for the respondent. I. The evidence established beyond controversy the adoption by the plaintiff as early as the year 1839 of "No. 303" as his trade mark for this pen. "No. 303" may be made a trade mark of a manufacturer as well as any other word or device which does not itself by its common meaning import quality or character. Being wholly arbitrary and a combination of numerals, it is especially fitted for the use of a manufacturer of small articles, by which to make them known to the public, and to distinguish them from all others whether made by himself or other persons. It leaves all other combinations open to the public ; and this combination also as to all other articles. It is no objection to a trade mark that it is composed of a word or words in common use. A manufacturer is not obliged to go out of the language to find words for his trade mark ; symbols and devices may also be trade marks ; and single letters and figures as well as words. All the cases support

this. (*Stokes* v. *Landgraff,* 17 *Barbour,* 612. *Bloss* v. *Bloomer,* 23 *id.* 609. *Clark* v. *Clark,* 25 *id.* 79. *Brooklyn White Lead Co.* v *Masury, Id.* 418. *Howard* v. *Henriques,* 3 *Sandf.* 727.)

This trade mark is protected by the statute of 1862. (*Chap.* 306, §§ 1 *and* 4. *Upton on trade marks—passim.*)

II. It is equally clear on the pleadings and proofs that the defendants infringe the plaintiff's trade mark.

III. The defendants failed in their attempts to justify the use of the trade mark. 1. It is transparent on the whole case that the defendants adopted the mark "No. 303" on pens similar in appearance, and put up in boxes containing similar designs, because the plaintiff's pens thus marked and put up had acquired a high reputation, and were very saleable—indeed "*the most saleable of any pen in the market.*" 2. The defendants also set up that it was used by the plaintiff and other parties and by themselves to denote the *quality* of the pens. Of this there was no proof, except the use of it by themselves and others on pens of similar patterns, as infringers. "No. 303" can not denote quality. It denotes a particular *kind* of pen of the plaintiff's, and the infringements of the defendants and others, and the No. was entirely arbitrary as admitted, by every witness. 3. The defendants proved that others, dealers, not manufacturers, had for a number of years been infringing by using the mark "No. 303." It was clearly shown that this was not done until the plaintiff had established the reputation of his pen "No. 303," and that his use of that design was continuous and uninterrupted ; and under a constant protest against these infringements. Persons who fraudulently trespass on the rights of another, knowing such rights, do not acquire a *right* to do so. They all knew of Gillott's right, and used this "No. 303," put up in boxes of a particular form and design—because the plaintiff's "303" was the most popular pen in the market. As to acquiescence, see *Amoskeag Manufg. Co.* v. *Spear,* (2

*Sandf.* 608, *p.* 615.)   As to simulation of form, style and manner of label, see *Wolf* v. *Goulard*—opinion of Judge Leonard.

IV.   The exceptions taken on the trial were not well taken.

LEONARD, J.   The design to defraud by manufacturing and packing pens in all respects similar to the plaintiff's, excepting only in the use of the name, appears very plainly. I can not reason so artificially as to disguise this conclusion from myself.

The plaintiff had the number "303" first in use.   We see, by his notice or "*caution,*" that he knew that others, also, had used the same combination of numbers, for the purpose of defrauding him; but it does not appear that he had discovered any individual whom he could attack as an offender. Nor can I believe that a "caution" to the public against the fraudulent use of his device can be deemed an acquiescence in the use by others of the particular arrangement of numbers upon steel pens and packing boxes, which the plaintiff had first adopted and used, and which had come to be a designation of a particular and popular pen with the public.

It is also to be observed that the defendants have not excepted to any fact as found by the judge.   The exceptions are confined only to the conclusions of law.   As the defendants have found no fault with the facts as found by the judge who tried the canse, the general term ought not to discover any; particularly as it does not aid the ends of justice.

I am for affirmance of the judgment, with costs.

CLERKE, J.   I concur in the conclusion at which Judge Leonard has arrived.

INGRAHAM. J. (dissenting.)   The findings of the judge at special term in the defendants' favor on all the questions raised in this case except one, leaves us nothing to examine except in regard to that one point, on which he has adjudged that the plaintiff is entitled to have the injunction sustained.

The action was brought to protect the plaintiff in the use of certain trade marks which he claimed as his own, connected with his manufacture of steel pens. It is not pretended that the defendants used the plaintiff's name, and the court below decided that the labels, boxes and packages, although similar to the plaintiff's, were in no way violations of the plaintiff's rights. The defendants upon their boxes placed their own names, and the evidence showed that for more than twenty years the manufacturers in England have been in the habit of putting up pens manufactured by them for different persons with the name of such person on the boxes, and all of them containing on the face of the boxes "No. 303." It is for this number that the plaintiff claimed a right as a trade mark, and the injunction was made perpetual as to the use of that number. No claim is made that this number in any way designates the plaintiff, or any thing of his manufacture, but he claims to have a right of property in it as a trade mark because he first applied its use to pens manufactured by him. The only evidence on this point is that he first sold the pens in this country with the number on the boxes; but the evidence shows that prior to that time, the number was used on boxes of various dealers in England. The defendants' witnesses also testify that this number is not used to designate any particular manufacture, but the quality or degree of fineness of the pen, and that it is not peculiar to any manufacture of the plaintiff.

The question involved in this case was directly examined and passed upon by Duer, J. in 1849, in *The Amoskeag M. Co.* v. *Spear*, (2 *Sandf.* 599.) In that case the plaintiffs claimed the letters A. C. A. stamped upon their labels on tickings manufactured by them. It was not denied but that the plaintiffs first used these letters, and they gave evidence that the letters A. and C. were the initials of their name, Amoskeag & Company, and the other A. was to describe the quality. In that case Duer, J. held that the plaintiffs were

not entitled to the exclusive use of any letters, numbers, or other marks intended to designate quality or merely a substitute therefor, and dissolved the injunction as to those letters.

In *Stokes* v. *Landgraff*, (17 *Barb.* 608,) a similar question was decided in the 7th district. In that case, the plaintiff, who was a manufacturer of glass, caused the boxes to be branded with the words "Galen, Lake, Cylinder, Wayne or New York," which had been used by his predecessor in business to distinguish the different qualities of glass which he sold. These marks were imitated and copied by the defendants. Strong, J. held that these marks or words were not used by the plaintiff to distinguish his glass, or glass of his manufacture. He says : "Neither of the words, in its ordinary sense, expresses the manufacture, or the manufactory, or where the manufactory is," and the injunction in that case was vacated.

In *Corwin* v. *Daley*, (7 *Bosw.* 222,) the plaintiffs claimed a right to the use of the words club house, as a prefix to gin sold by them. In deciding that case, Robertson, J. refers to the case of *The Collins Co.* v. *Cowen*, (3 *Kay. & John.* 428,) in which the Vice Chancellor of England lays down the rule as to trade marks as follows : " There is no such thing as property in a trade mark as an abstract name. It is the right which a person has to use a certain name for articles which he has manufactured, * * * because the mark or name denotes that articles so marked, were manufactured by a certain person, and no one else can have the right to put the same name upon his goods and thus represent them to have been manufactured by the person whose mark it is." After examination of various cases in England and this country, he concludes, "that the general rule is against appropriating mere words as a trade mark. The exception is of those indicating ownership or origin, having no reference to quality or use. They are but a symbol, which from the nature of

the fact they are used to signify, others might employ with equal truth and therefore have an equal right to employ them for the same purpose.["]

There is also another fact connected with the labels used by both parties, which bears upon the question under discussion. It is that both parties have placed openly and distinctly upon their pens and packages their own names as the manufacturers. It is difficult to see how the defendants could impose their pens on the public as made by Gillott, with such a distinct avowal of their own names as the makers. Unless the intent in using a trade mark is to mislead the public by selling the goods as manufactured by the party seeking to prevent its use, he can have no claim therefore. This was so held in *Singleton* v. *Bolton,* (26 *C. L.* 169, *S. C. 3 Doug.* 293,) where it was said, " when both parties use the same mark and no evidence is given that the defendant sold the goods as if prepared by the plaintiff, though he was the inventor, no action lies."

It is evident from the testimony in the case, and even from that of Mr. Owen, the plaintiff's agent, that the patterns of the different pens are distinguished by numbers. These seem to have been arbitrarily selected, and yet are known to the trade as distinguishing different patterns and qualities of pen, whether made by the plaintiff or others. As such they have been used by various manufacturers and dealers for upwards of twenty years. The judge at the circuit found that the plaintiff had no knowledge that the number 303 had been so used by others. And yet there is in evidence a notice placed in every box of the plaintiff's pens which have been used for more than twenty years, stating that " other makers had adopted the above number (303) by which the original Gillott's Victoria Pen is known."

It seems to me that this use of the number 303, by other dealers for more than twenty years, which fact was known to the plaintiff, must be treated as an aquiescence by him in its use, even if he could be considered as having a right to it.

There was error in holding that the plaintiff, by the use of this number, became entitled to the exclusive use thereof and to the profits thereof, and that he is entitled to an injunction restraining the defendants from the use thereof.

The judgment should be reversed.

Judgment affirmed.

[NEW YORK GENERAL TERM, January 8, 1867, *Leonard, Clerke* and *Ingraham,* Justices.]