By the Court. Duer, J.
I am satisfied that this injunction ought not to be wholly dissolved, and equally so that upon the case, as it now stands, it cannot be sustained in the full extent to which it has been granted.
I shall first state the general rules that, as I conceive, belong to the subject, and then endeavor to apply those rules to the special facts in this case.
It has been said, that the doctrine of an exclusive property in trade-marks has prevailed from the time of the year books, (2 Keen, 218 ;) but it is certain that the jurisdiction, in relation to *605 such marks, that courts of equity now exercise, is of recent origin. Originally the party claiming to be the owner of a trade-mark, was left to establish his right and seek his remedy in a court of law. Lord Hardwicke refused an injunction, in a case in which, at the present day, one would certainly be granted, and he accompanied the refusal with the remark, that “ he knew of no instance of granting an injunction to restrain one trader from using the trade-mark of another, and that, in his opinion, it would be of mischievous consequence to do so.” (Blanchard v. Hill, 2 Atk. 284.) The apprehension of mischievous consequences that this eminent judge felt and expressed, experience has shown to be groundless, and the doctrine which he rejected, is now established, and established, as all admit, upon just and rational grounds.
Every manufacturer, and every merchant for whom goods are manufactured, has an unquestionable right to distinguish the goods that he manufactures or sells, by a peculiar mark or device, in order that they may be known as his in the market for which he intends them, and that he may thus secure the profits that their superior repute as his,-may be the means of gaining. His trade-mark is an assurance to the public of the quality of his goods, and a pledge of his own integrity in their manufacture and sale. To protect him, therefore, in the exclusive use of the mark that he appropriates, is not only the evident duty of a court as an act of justice, but the interests of the public, as well as of individuals, require that the necessary protection shall be given. It is a mistake to suppose that this necessary protection can operate as an injurious restraint upon the freedom of trade. Its direct tendency is to produce and encourage a competition by which the interests of the public are sure to be promoted ; a competition that stimulates effort and leads to excellence from the certainty of an adequate reward. When we consider the nature of the wrong that is committed when the right of property in a trade-mark is invaded, the necessity for the interposition of a court of equity becomes still more apparent. He who affixes to his own goods an imitation of an original trade-mark, by which those of another are distinguished and known, seeks, by deceiving the public, to divert and appropriate to his own use, the profits *606 to which the superior skill and enterprise of the other had given him a prior and exclusive title. He endeavors by a false representation, to effect a dishonest purpose ; he commits a fraud upon the public, and upon the true owner of the trade-mark. The purchaser has imposed upon him an article that he never meant to buy, and the owner is robbed of the fruits of the reputation that he had successfully labored to earn. In his case there is a fraud coupled with damage, and a court of equity in refusing to restrain the wrong doer by an injunction, would violate the principles upon" which a large portion of its jurisdiction is founded, and abjure the exercise of its most important functions, the suppression of fraud and the prevention of a mischief that otherwise may prove to be irreparable.
The principles that have now been stated as the foundation of the jurisdiction of the court, are clearly expressed or necessarily implied in nearly all the decisions ;|ánd I refer especially to j the language of the judges in Blofield v. Payne, 4 B. & Ad. 410, and in Crawshay v. Thompson, 4 Man. & Gr. 357; and to / the lucid opinions of the master of the rolls in Knott v. Cologan, 2 Keen, 213 ; and in Croft v. Day, 7 Beavan, 84. It is not, however, to be denied that the power of granting an injunction to restrain an unauthorized use of trade-marks, ought to be exercised with great caution, so as not to transgress the limits that a just regard to the rights of individuals and the interests of the public must be admitted to prescribe. It is not to be exercised where the legal right is disputed and is doubtful; it is not to be exercised so as to involve a violation of the principles upon which it is founded; it is not to be exercised so as to create a monopoly unjust to other manufacturers, and, of necessity, prejudicial to the public. The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to an exclusive use of any words, letters, figures or symbols, which have no relation to the origin or ownership of the goods, but are only meant to indicate their name or quality. He has no right to appropriate a sign or symbol which, from the nature of the fact which it is used to signify *607 others may employ with equal truth, and therefore have an equal right to employ, for the same purpose. Were such an appropriation to be sanctioned by an injunction, the action of a court of equity would be as injurions to the public as it is now beneficial ; it would have the effect in many instances of creating a monopoly in the sale of particular goods, as exclusive as if secured by a patent, and freed from any limitation of time. The importance of the distinction that I have endeavored to explain, in its application to the present case will hereafter appear. At present, it is sufficient to say, that in all cases where a trademark is imitated, the essence of the wrong consists in the sale of the goods of one manufacturer or vendor, as those of another, and it is only when this false representation is directly or indirectly made, and only to the extent in which it is made, that the party who appeals to the justice of the court can have a title to relief.
It is evident, however, that in order to convey a false impression to the mind of the public as to the true origin or manufacture of goods it is not necessary that the imitation of an original trade-mark shall be exact or perfect. It may be limited and partial. It may embrace variations that a comparison with the original would instantly disclose, yet a resemblance may still exist that was designed to mislead the public, and the effect intended may have been produced; nor can it be doubted that whenever this design is apparent, and this effect has followed, an injunction may rightfully be issued, and ought to be issued.
To select a case of a very partial imitation. No person can be justified in affixing to his own goods, whether by stamp, label, or otherwise, the name or style of another person, firm, or company known to be the manufacturers of similar goods; although all other particulars contained in the real trade-mark of those manufacturers, may be wholly omitted. Such a use of the names or style of other manufacturers, is, generally speaking, conclusive evidence of a fraudulent intent; but even where no fraud can be justly imputed, where the use of the name or style originated in mistake, and not in design, although the party may be exempted from damages and costs, the continuance of the use may be justly restrained, since it involves a vio *608 lation of a right of property, that if persisted in with a knowledge of the fact, would be fraudulent. In Millington v. Fox, 3 Mylne & Craig, 338, the defendants had stamped upon the steel which they sold, the words “ Crawley,” or “ Crawley Millington ;” not knowing or believing that these were the names of other manufacturers, and were stamped by them upon steel of their own manufacture ; but supposing that the words were descriptive of the particular kind or quality of the steel. Their mistake, however, was rendered apparent by the evidence, and upon this ground Lord Cottenham, while he wholly acquitted them of any fraudulent design, decreed a perpetual injunction. Such, I conceive, is the true explanation of a decision, the authority of which the learned counsel for the defendants strenuously denied, while on the other hand it was urged by the counsel for the plaintiffs as supporting a doctrine much broader than it appears to warrant.
Nor is it by any means necessary, in order to render the imitation of a trade-mark culpable, and justify the interference of the court, that it shall contain any forgery, (for as such, the act when intentional, deserves to be branded,) of the name of the owner of the original mark, or of the person from whom he derived his title. In addition to the name of the proprietor, the original mark may exhibit some peculiar device, vignette or symbol, stamped, printed or engraved, which he had a perfect right to appropriate, and which, as well as the name, was intended as a declaration to the public of his right of property, and was adopted as an additional security against its invasion. In an imitation of the original mark upon an article or goods of the same description, the name of the proprietor may be omitted, another name, that of the imitator himself may be substituted, but if the. peculiar device is copied, and so copied as to manifest a design of misleading the public, the omission or variation ought to be wholly, disregarded. Its objects, we may be certain, was not to communicate the truth, but to escape the penalty of falsehood; a fraud is intended, an unlawful gain is meant to be realized, but it is believed or hoped that an injunction may be avoided, and a claim for profits or damages be repelled. The *609 fraud, however, if a court of equity is true to its principles, will be suppressed and its fruits be intercepted or restored.
My conclusions on this branch of the subject are, that an injunction ought to be granted, whenever the design of a person who imitates a trade-mark, his design apparent or proved, is to impose his own goods upon the public as those of the owner of the mark, and the imitation is such that the success of the design is a probable or even possible consequence ; and that an injunction must be granted whenever the public is in fact misled, whether intentionally or otherwise, by the imitation or adoption of marks, forms or symbols which the party who first employed them had a right to appropriate, and this for the plain reason that when a right of property has been thus acquired, it mxrst be protected.
It must not, however, be inferred from these remarks, that an injunction ought to be granted whenever there exists such a resemblance between trade-marks as may induce a belief in the mind of the public that they belong to, and designate the goods of, the same trader or manufacturer. It is not enough that the public may be misled, or has been misled. As already intimated, the resemblance must arise from the imitation or adoption of those words, marks or signs, which the person who first employed them had a right to appropriate as indicating the true origin or ownership of the article or fabric to which they are attached; and the resemblance, where it induces error and gives a title to relief, must amount to a false representation express or implied, designed or accidental, of the same fact. A trade-mark is frequently designed to convey information as to several distinct and independent facts, and therefore contains separate words, marks or signs, applicable to each, thus indicating not only the origin or ownership of the article or fabric to which it is attached, but its appropriate name, the mode or process of its manufacture, and its peculiar or relative quality. It is certain, however, that the use by another manufacturer of the words or signs indicative only of these circumstances, may yet have the effect of misleading the public as to the true origin of the goods ; but it would be unreasonable to suppose that he is therefore precluded from using them as an *610 expression of the facts which they really signify, and which may be just as true in relation to his goods as to those of another. Purchasers may be deceivedj they may buy the goods of one person as those of another, but they are not deceived by a false representation: they are deceived because certain words or signs suggest a meaning to their minds, which they do not in reality bear and were not designed to convey. We may draw an illustration from the present ease. The goods of the defendants, to which their trade-mark is attached, are certainly “ tickings,” they are woven by a power-loom, and they are the first quality of the tickings which they manufacture or sell. Hence they have a perfect right to print or stamp upon their label the words 11 Tickings,” “ Power-Loom,” and “ First duality,” or “ Superfine,” nor can I believe that their right to do so would in the slightest degree be impaired or affected, were it proved that the plaintiffs had previously, and for a long series of years, used the same words in their own trade-mark upon similar goods, and had founded upon such use a claim of exclusive property. Nor would the case, in my judgment, be altered, should it appear that owing to these circumstances the plaintiffs tickings had become generally known in the market as “ Power-Loom Tickings,” or “ Superfine Tickings,” so as to induce a general belief that all tickings upon which these words were labelled, were in reality their manufacture. This error, however general, could never confer the right of property which it supposes to exist. The counsel for the defendants strenuously insisted that names cannot he appropriated, that a just title to their exclusive use can never he acquired, and he doubtless referred to those names, general or specific, of things, modes or qualities, which form a part of our common language, and which all of us therefore, have a right to employ when we wish to communicate the facts they are used to signify; and thus explained, the proposition, so far from being at all doubtful, is a certain, and in its application to cases like the present, a luminous and a guiding truth.
'" The positions that have been thus stated and illustrated, appear to me so evidently true, as not to require any support from *611 authority; but the authorities are, in fact, numerous and decisive, and to a few of the cases I shall now refer.
The earliest case is Singleton v. Bolton, 3 Doug. 293. The plaintiff’s father, and after his death the plaintiff had been, for a long time, in the practice of selling a particular medicine, under the name of “ Dr. Johnson’s Yellow Ointment;” the defendant had commenced selling the same ointment under the same name, and for this supposed invasion of his exclusive right, the plaintiff brought his action. Although these facts were proved upon the trial, the plaintiff was non-suited, and the non-suit was ■confirmed by the court of king’s bench. Lord Mansfield, in giving the opinion of the court, said, that it was not pretended that the plaintiff had any exclusive right in the medicine itself, and the defendant had, therefore, an equal right to prepare and sell it under the same name that the plaintiff used, there being no evidence to show that he sold it as if prepared by the plaintiff; in other words, there being no false representation. In this case, the words “ Doctor Johnson” were the name of the inventor of the medicine, but by long use they had become a part of the proper name of the medicine itself, which name all persons had, consequently an equal right to employ.
The case of Canham v. Jones, 2 Ves. & Beames, 218, was decided by the vice-chancellor, (Sir Thomas Plumer,) upon the same principle. The bill was filed to restrain the defendant from preparing and selling a medicine called “ Yelno’s Vegetable Syrup,” and it asserted that the plaintiff had acquired an exclusive right in the medicine itself, and in the use of the name by which it was generally known. To this bill there was a general demurrer, and upon the argument the plaintiff’s counsel did not attempt to maintain his case upon the ground that he could justly claim an exclusive right in the medicine, but they insisted that he had acquired the right, by a prior occupation, of using exclusively the particular name by which the medicine was called, and that the defendant was guilty of a fraudulent invasion of this right, in selling the composition prepared by himself by the same name. The vice-chancellor was, however, of opinion that, as the plaintiff had no exclusive right in the medicine, *612 it was a necessary consequence that he could have none in the use of its name, and therefore allowing the demurrer.
In Perry v. Truffit, 6 Beavan, 66, the plaintiff was the original vendor of a medicine which he labelled as “Perry’s Medicated Mexican Balm.” The defendant afterwards prepared and sold the same or a similar medicine, which he labelled as “ Truffit’s Medicated Mexican Balm.” The bill was in the usual form for an injunction and an account. An injunction was denied, but although the master of the rolls, when he refused it, retained the bill for the purpose of enabling the plaintiff to establish his right by an action at law, he was evidently of opinion that his legal right could never be established. His opinion evidently was, that as the words “ Medicated Mexican Balm” might be just as true a description of the medicine of the defendant as of that of the plaintiff, the former had an equal right to use them. This opinion seems to cover the whole ground. “ Balm” was the general, “ Mexican Balm” the specific name of the medicine, and the word “ Medicated” indicated its quality and the mode of its preparation. No action at law was brought by the plaintiff, plainly from the conviction of his counsel, that he could not succeed, and the bill was finally dismissed, with costs.
In Millington v. Fox, had the defendants been right in then-supposition that the words “ Crawley” and “ Crawley Milling-ton,” were descriptive only of the kind or quality of the steel upon which they were stamped, it is manifest, both from the arguments and admissions of the counsel, and the reasoning of the chancellor, that a perpetual injunction would not have been decreed.
I shall now proceed to apply the observations that have been made to the facts in this case. When I compare the original trade-mark of the plaintiffs with that set forth in the complaint, of which the defendants have' now relinquished the use, I find it impossible to doubt that the latter is a designed, elaborate imitation of the former. They are the same in form, size and color ; it is only by a very close inspection) that the ornamented border can be at all distinguished. In the centre of each we find the same words and letters in the same relative positions, “Power Loom”; “ yds.”; “ACA”; and the only differences are, that at *613 the top, immediately under the vignette, the words “Lowell Premium Tickings,” are substituted, in the label of the defendants, for the words “ Amoskeag Manufacturing Company,” in that of the plaintiffs, and at the bottom the words “Warranted Indigo Blue,” for “ Amoskeag Falls, N. H.” ; variations scarcely impairing, far less sufficient to destroy, a general resemblance that was calculated to deceive the public, and by which the evidence is abundant and conclusive to show that many dealers have been, in fact, deceived. Under these circumstances, I cannot attach any importance to the denial by the defendants in their answer, of any intention to injure or defraud the plaintiffs. They acted with a design, and it would be absurd to suppose that this design had no further object than the mere imitation of the trade-mark which they copied. In attaching their simulated label to tickings resembling in appearance and quality those of the plaintiffs, they undoubtedly meant to gain an advantage in the sale; they meant to secure to their goods a preference in the market that they would not otherwise have commanded; nor can I understand how this advantage could be gained, unless their tickings were to be sold and purchased as those of the plaintiffs. Had they only wished to secure a preference to their goods, as their oivn, an imitation of the trade-mark of the manufacturers was worse than useless. It had a direct tendency to defeat that object, and it is manifest that had' such been their object, no such imitation would have been attempted or thought of. It would not have been attempted or thought of, but from the hope of gains it was to be the means and instrument of realizing. I cannot, therefore, escape from the conviction that the real motive of the defendants was an expectation of the benefits to result to themselves from the error of purchasers, and from the imposition upon purchasers that subordinate dealers would be tempted and enabled to practice; and I assent entirely to the observations of the vice-chancellor, in Coales v. Holbrook, 2 Sandford’s Ch. Rep. 586, that even where no false representation is directly made, the imitation of a trade-mark, prompted by such motives, is, in judgment of law, a fraud, the profits of which must be accounted for, and the continuance of which a court of equity is bound to inhibit.
*614 It is said, however, and was strongly pressed upon the argument, that the defendants had provided an effectual security against the imposition of dealers, and the mistakes of purchasers, by substituting upon their label the words “ Lowell Premium Tickings,” in place of “ Amoskeag Manufacturing Company,” in that of the plaintiffs; but I cannot think so. I cannot think that this security is provided, or was meant to be provided, for not only may the substituted words, as is proved to have been the case, from their position, wholly escape the attention of purchasers, but when read, they may not have the effect of altering the belief that the general resemblance of the labels is calculated to produce. The words are exceedingly ambiguous ; they are not a declaration that the tickings are not manufactured by the plaintiffs, but are entirely consistent with the supposition that they are. As the label upon which they are found is, in other respects, that of the plaintiffs, they may well be construed as an assertion that tickings belonging to the plaintiffs, corresponding in quality with those to which the label is attached, had gained, at Lowell, the premium to which the words refer; nor is it at all improbable that many purchasers have thus understood them, and have believed that the very fact that such a premium had been gained, was the cause of an alteration in the label. If the defendants were personally asked, whether the tickings which they sell are the manufacture of the plaintiffs, it would be an equivocation to reply, abstaining from a positive negative, “ They are Lowell Premium Tickings.” And it is this equivocation which they stamp upon their label, and which they utter to all who purchase the tickings to which that label is attached. I do not pretend to know the exact meaning of the words “ Lowell Premium Tickings,” nor have the defendants or their counsel attempted to explain them. Their apparent meaning, that which at once strikes the mind, is, that tickings of the same fabric as those which the words are used to designate, in a competition at Lowell, had gained a premium, as the best quality of American tickings; and if this assertion is untrue, whether injurious or not to the plaintiffs, it is a fraud upon the public. It is possible that the defendants may attach a different meaning to the words, and that the meaning which they attach to them may be true : *615 but if so, as the words are equivocal and are calculated to deceive the public, their use, until their true meaning is explained, ought to be discontinued, and, I hope, will be discontinued.
Were it in my power, however, to view the conduct of the defendants in a more favorable light than I am now able to do, could I wholly acquit them of any fraudulent intent, it still remains true that they have imitated and adopted those parts of an original trade-mark which the plaintiffs had a right to appropriate for the purpose of securing their own title as manufacturers, and that the public had been misled by the resemblance in the labels thus produced, and I have already stated that the concurrence of these facts is alone sufficient to render it the duty of tire court to interfere by an injunction.
The allegation that there has been such an acquiescence for some years on the part of the plaintiffs in the conduct of the defendants, as to bar the former from the relief they now seek, I cannot regard ; not only is the allegation sufficiently disproved, but I am satisfied that the doctrine of acquiescence operating as an absolute surrender of an exclusive right, is inapplicable to the case. The consent of a manufacturer to the use or imitation of his trade-mark by another, may, perhaps, be justly inferred from his knowledge and silence; but such a consent, whether expressed or implied," when purely gratuitous, may certainly be withdrawn, and when implied, it lasts no longer than the silence from which it springs ; it is in reality no more than a revocable license. The existence of the fact may be a very proper subject of inquiry in taking an account of profits, if such an account shall hereafter be decreed; but even the admission of the fact would furnish no reason for refusing an injunction.
As a necessary consequence of what has been said, I must retain all that part of the injunction which precedes the words “ or having thereon the letters ‘ A O A’,” to which I add the words u or being a colorable imitation thereof.” I borrow these last words from the form of the injunction which was granted and framed by the master of the rolls in Knott v. Morgan, and which he afterwards followed in Croft v. Day; and I adopt them, in the sense in which he doubtless employed them, as denoting such an imitation as is designed and calculated to mislead *616 the public as to the true origin or ownership of the article or fabric to which it is attached.
I pass now to the question which the parties evidently consider as practically the most important, namely, whether the residue of the injunction shall be stricken out or retained? The injunction, as it now stands, prohibits the defendants from using any stamp, mark, or label, for or upon any tickings having thereon the letters “AC A,” and the propriety of continuing this prohibition in force, depends upon the fact whether the plaintiffs have shown an exclusive title to the use of these letters upon their own tickings as declaratory of their right of property as manufacturers. If they have, the prohibition must be retained, but if the letters “AC A,” as used by them, are merely an indication of the relative quality of their tickings, it must be expunged. As the plaintiffs could not have acquired by their prior occupation, an exclusive right in the use of the words “ First Quality,” or “ Superfine,” they cannot have acquired a right by similar means to an exclusive use of any letters, marks, or other signs, which are merely a substitute for the words, and intended to convey the same meaning. It is immaterial whether words, or letters, or figures, or any other signs, are used, if the' single fact which they are used to indicate or declare, is a truth that other manufacturers or dealers have an t qual right to express and communicate.
The complaint avers that the letters “ A C A” signify as follows : “A C,” Amoskeag Company, and “A,”best quality—and several of the witnesses, whose affidavits are produced, swear that the letters are so understood by them, and as they believe, are so generally understood. On the other hand, these allegations are explicitly denied by the defendants, who aver in their answer that it is the universal practice of manufacturers to distinguish the various qualities of their goods by one or more letters of the alphabet, and that the letters “AC A” in the label of the plaintiffs, are only used and intended to be understood as a declaration to the public, that the tickings to which the label is attached, are the best quality of those which they manufacture. Such are not the exact words, but such is the substance of the averments in the answer, and the conclusion to which *617 my reflections have led me, is that these averments are true. I was doubtless of importance to the plaintiffs to make known to the public by a declaration in their label, that they are the manufacturers of the excellent tickings which they send into the market, and for this reason the name of their corporation “ Amoskeag Manufacturing Company,” appears. in full upon their label. The purchasers of the tickings either read these words or they do not; if they do, the letters “AC A,” even if they understand them as indicating the name of the company give them no additional information; if they do not, the meaning of the letters, if such is their meaning, will not be understood. To the first, the letters thus interpreted are useless, and to the second unintelligible ; it is a self-evident truth, that initial letters can never communicate the knowledge of a name to those who were previously ignorant of it. The only purpose they can answer. is that of recalling a name already known. Nor is this all; the letters “ A C,” considered as initials, would not probably have the effect even of recalling the name which they are said to signify; to answer this purpose, it is plainly necessary that the initial letter of each word comprising the name, whether of an individual or of a corporation, should be given, and this, where initials are used as the substitute for a name, is the universal practice. Here the letter “ M” is omitted, yet the word “ Manufacturing” is an essential part of the corporate name ; it is therefore highly improbable that the letters “ A C” were used by the plaintiffs in a sense in which it was most unlikely that others would understand them. They probably adopted these letters because they were partly the initials of their corporate name, but it is not, I am persuaded, for the purpose of signifying that name, and thus indicating their ownership that they employ them; their value and meaning is wholly different. The final letter “ A,” we are told, is alone used to designate the quality of the tickings; it alone signifies that they are the best quality of those which the plaintiffs manufacture; but if this were true, the letters “ A C” might be erased, and the final “ A” as a designation of that quality, would alone be sufficient. It is, however, admitted that such is not the fact. Another label which the plaintiffs attach to their tickings was *618 produced upon the hearing, resembling in all respects that set forth in the complaint, except that the single letter “A” is found in the same place as the three letters “AC A,” and it was admitted that this label is only attached to tickings of the second quality—while that containing the three letters is reserved and is used exclusively for those of the' best. The conclusion is not to be resisted ; it is to designate the best quality of tickings that the three letters are used, it is this purpose which they answer, and none other.
The plaintiffs aver in their complaint that they have invented a stamp or label, the same which they set forth “ by which to designate the best quality of their tickings but how have they effected this object 1 Strike from their label the letters “ A C,” there is no such designation ; restore them, it is found. As the use of the three letters conjointly is therefore necessary to express the meaning which the plaintiffs admit that they intended to convey, I am forced to believe that it was for this purpose that they were first adopted, and are alone employed. It is doubtless true, as is stated in the complaint, and sworn in many of the affidavits, that the tickings of the plaintiffs, to which their ACA label is attached, have for many years been known in the market as the “ACA Tickings,” but this fact neither alters the meaning of the letters, nor takes from others the right to employ them. If the letters designate only the quality of the goods and not their origin or ownership, the tickings of the defendants, if the best quality of those which they sell, are as truly “ACA Tickings” as those of the plaintiffs. The words “ Power Loom” are found. upon the label of the plaintiffs, yet it is not contended that I could restrain the defendant from using the same words as they have done upon their own. If there exists a distinction, I am unable to perceive it. The claim of an exclusive right rests in both cases upon the same grounds; it is valid in both, or in neither.
Were my opinion upon this question less clear and decided than it actually is, I should still be unable to retain the injunction in its present form. The rule is fully settled and is recognized in nearly ail the cases that in suits of this nature an injunction is never to be granted in the first instance, if the excln *619 sive title of the plaintiff is denied, unless the grounds upon which it is denied are manifestly frivolous. When the title is disputed, the course is to let the motion for a,n injunction stand over until the plaintiff has established his legal right in an action at law. The obligation of following this general rule, was distinctly admitted by our late chancellor, in Partridge v. Menck, 2 Sandf. Ch. R. 622, 625 ; S. C. 2 Barb. Ch. R. 101. In Motley v. Downman, 3 Mylne & Craig, 14, where the rule was followed, Lord Cottenham uses the strong expressions that “ he cannot conceive a case in which the court will interfere at once by an injunction so as to prevent the defendant from disputing the plaintiff’s legal title.” The legal title of the plaintiffs in the present case to the exclusive use of these significant letters A C A, is denied, and certainly not upon frivolous grounds, since I have not understood the counsel for the plaintiffs to deny, that if the averments in the answer shall he sustained by proof, the title as claimed cannot be supported. By our present practice, I cannot direct an action at law to enable the plaintiffs to establish their right, for if I rightly understand the provisions of the code, the present suit is such an action, and in reality every complaint, whatever the nature of the facts set forth, or the relief that is sought, is at once a declaration at law, and a bill in equity. I can give to the defendants, however, the benefit of the general rule, by so modifying the injunction as not to restrain them from using the letters A 0 A, until the legal right of the plaintiff shall have been established by the verdict of a jury in this suit, and I am satisfied that it is this course that I should be bound to follow even were my opinion as to their legal right widely different from that which I have expressed. The injunction must therefore be modified by striking out all that part of it which commences with the words “or having thereon,” and ends with the words “ ticket or otherwise.”(a) No costs are given to either party, and I presume none are desired.
*620 I ought not to close this opinion without expressing my thanks to the counsel of the parties for the singular ability, learning, and candor with which they conducted the argument. The task of a judge, when thus assisted, is comparatively light and his errors hardly to be excused.

 The injunction was thereupon modified so as to leave the defendants at liberty ic use the letters A C A in their labels.