(5 Misc. Rep. 78.)

DR. JAEGER'S SANITARY WOOLEN SYSTEM CO. v. LE BOUTILLIER.

(Superior Court of New York City, Special Term. September, 1893.)

1. TRADE-MARK—DESCRIPTIVE NAME—RIGHT TO EXCLUSIVE USE.
    One J. originated, and, by public lectures in a foreign country, advocated, the use of a distinctive kind of sanitary underwear. The underwear was manufactured by various persons and used several years before a certain firm began its manufacture in the foreign country, under an arrangement with J. for its exclusive manufacture, and the use of his

name in connection with other terms used by him to designate his peculiar kind of underwear, as a trade-mark. *Held,* that such firm did not have, seven years thereafter, any exclusive proprietary right in the name of J. as applied to underwear in the United States, where underwear having the same descriptive name had been sold by various dealers for years, even if it acquired such right in such foreign country.

2. SAME—USE OF NAME ON INFERIOR GOODS—ACCOUNTING AND INJUNCTION.

But where, in an action by the assignee of such firm to enjoin defendant from selling such underwear, it appears that the kind originated by J., and manufactured and sold by plaintiff and its predecessors, were all-wool garments, and that defendant, by the use of such name to designate the kind and quality of his goods, sold as the same kind of underwear an inferior article containing a substantial admixture of cotton, such use is an untrue and deceptive representation, against which plaintiff is entitled to relief.

3. SAME—EXTENT OF INJUNCTION.

In such case defendant will be enjoined from advertising, or in any way representing, that the underwear sold by him, containing an admixture of cotton, is the kind and quality of underwear designated by the use of such name, and from so using J.'s name in connection with the word "Genuine," or other word or words, and from advertising or representing his underwear by any designation containing such name.

Action by the Dr. Jaeger's Sanitary Woolen System Company against George Le Boutillier, trading under the name of Le Boutillier Bros., for an accounting and injunction.   Decree for plaintiff.

The material allegations of the pleadings are as follows: The plaintiff alleges in its complaint that William Benger's Sons, of Stuttgart, Germany, since the year 1879, have been manufacturers of underwear which they have designated by the terms "Dr. Jaeger's Normal Underwear," but chiefly by the term "Jaeger's" or "Dr. Jaeger's;" that, from the beginning of such manufacture, they adopted said terms to designate the underwear manufactured by them, and from that time used those names in advertisements and circulars, and on show cards, boxes, and labels, in connection with the sale of said underwear, and their underwear has become known to consumers, and is ordered, asked for, and identified by the trade and by the public, by those names; that William Benger's Sons have had associated with them, since said year 1879, one Professor or Doctor Gustav Jaeger, "who has during all of said time, superintended the manufacture of said underwear, and with whose permission and consent the name and marks above mentioned have been used to identify and distinguish the goods manufactured by said firm of William Benger's Sons;" that the underwear so manufactured consists exclusively of animal fiber, namely, "the best and finest pure wool, without any admixture of vegetable fiber whatever;" and that, by reason of the good quality of their goods, they have achieved a reputation, "particularly in the United States, where the said underwear dealt in by those people is and has been long and highly esteemed and sold in large quantities." The plaintiff further alleges that, in the year 1885, William Benger's Sons, in conjunction with Dr. Jaeger, granted the exclusive right to sell their underwear in the United States, under the designations aforesaid, to one Ihlee, who, in connection with certain other persons, named Tomlin and Sankey, under the name of "The Dr. Jaeger's Sanitary Woolen System Company," began the sale of said underwear in the United States, under the same designations, and continued so to do until on or about April 16, 1887, when the plaintiff. company was formed, and became the assignee of said rights claimed to have been acquired by Ihlee, Tomlin, and Sankey. The plaintiff further claims in its complaint to have the exclusive right to sell the underwear manufactured by William Benger's Sons within the United States, under the name of "Jaeger." It alleges that since its incorporation it has largely advertised this under-

wear; that it has become well known throughout the United States as being of high quality, made of the finest and best pure wool, under the supervision and approval of Dr. Jaeger. It further claims the exclusive right to the terms "Jaeger" and "Dr. Jaeger," as designating goods manufactured by William Benger's Sons, and solely dealt in in the United States by plaintiff, and that that right has been generally acquiesced in, with only a few exceptions. The plaintiff further alleges that defendant, "disregarding plaintiff's rights and the interests of the public, sells articles of underwear not manufactured by William Benger's Sons, but which are made in external appearance to imitate such goods, and similar thereto in construction, shape, and color, and which defendant sells under the name of 'Jaeger.'" The complaint also alleges that among the goods so sold by defendant were goods with an admixture of cotton, "producing an inferior article, intending to throw discredit upon the reputation of plaintiff and on the goods dealt in by the plaintiff;" and it also alleges that, in selling his goods over the counter, the defendant represents them as the same goods sold by Dr. Jaeger's Company, and that the effect of such alleged imitation, sale, and advertising is calculated to and does induce the purchasers and users of plaintiff's goods to buy the goods sold by defendant, in the belief that they are the said articles dealt in by the plaintiff. The complaint also alleges that these acts on the part of defendant are an imitation and infringement of plaintiff's trade-name or trade-mark, in consequence whereof the plaintiff has been damaged, and plaintiff asks for an injunction and an accounting.

The defendant, in his answer, denies all of the foregoing allegations, so far as they are material, and alleges that Dr. Jaeger did, in Germany, originate a system of manufacturing and wearing woolen undergarments, and did in numerous publications, writings, and public lectures advocate the desirability of wearing woolen garments made according to the system suggested or originated by him, and that underwear made pursuant to that system became widely known in Germany and throughout the world, under the names of "Normal Underwear," "Normal Sanitary Underwear System of Dr. Jaeger," "Jaeger Underwear," and "Dr. Jaeger's Normal Sanitary Underwear," and by such like designations containing the words "Normal," or "Dr. Jaeger," or "Professor Jaeger," or "System Dr. Jaeger." The answer also alleges that Dr. Jaeger was never engaged in any business, except that of professor or teacher in schools, academies, colleges, or universities, and was never engaged in the manufacture or sale of underwear made or manufactured according to his system, and that Dr. Jaeger never acquired any proprietary right in the words "Normal," "Jaeger," or "Dr. Jaeger," or "Professor Jaeger," as applied to underwear made according to the system suggested or originated by him. The answer also alleges that the words "Normal Sanitary Underwear System of Dr. Jaeger," as used by defendant to describe the underwear sold by him under the name of "Jaeger," truly described the nature and qualities of such goods, and that said designations are those by which the goods sold by him as Jaeger goods are known and designated in the dry goods markets of Europe and the United States, and truly describe the nature and quality of the goods sold. The answer further alleges that the quality of the goods sold by defendant as Jaeger goods are in every respect equal to the goods manufactured and sold by the plaintiff. The answer further alleges that a large number of manufacturers in Germany and elsewhere began to manufacture said articles according to the Jaeger system, after the publication and delivery of lectures by Dr. Jaeger in regard thereto, and that such manufacturers designated and sold their goods as Jaeger underwear, and that all of the Jaeger underwear sold by defendant was manufactured in Germany, according to the Jaeger system, and that the words "Normal" and "System Dr. Jaeger" are necessary, and the only words proper to describe goods and underwear made according to the system of Dr. Jaeger.

Gillender & Stoiber, (A. H. Stoiber and W. J. Curtis, of counsel,) for plaintiff.

John Delahunty, for defendant.

GILDERSLEEVE, J.   The plaintiff is a domestic corporation, doing business in the city of New York, and has a trade in the sale of underwear that extends over the whole country.   The defendant is a merchant doing business in said city under the name of "Le Boutillier Bros., of Fourteenth street," and deals extensively in underwear.   The grievance which the plaintiff seeks to remedy is the defendant's alleged unfair competition in business.   The alleged wrongful acts of defendant consist chiefly in the use by him of the name "Jaeger" or "Dr. Jaeger," as applied to underwear.

Ever since the commencement of traffic in civilized countries, marks have been a valuable aid to commerce as symbols of ownership or of origin.   Courts of equity look with favor upon fair competition in trade, as its tendency is to suppress monopolies, and to build up new enterprises, to the advantage of the general public. But courts have gone very far in the exercise of their power to restrain fraud in trade, and to prevent unfair competition in business.   The decisions bearing upon trade-marks, and their analogies, are very numerous.   The principles of law set forth in the following declarations and decisions must be held to be the law of this case:

The wrong in these cases consists in the sale of the goods of the fabric of one person as being those made by another; and it is only to the extent in which the false representation is directly or indirectly made that an injunction ought to be granted.   Manufacturing Co. v. Spear, 2 Sandf. 599.   A dealer cannot palm off his own goods for those of another.   The law does not permit a man to get another's business or injure his reputation by unfair means.   Where the manufacturer and seller of goods has attached a mark or device, word or expression, to the class of merchandise produced by him, in order to distinguish it from a like class of merchandise produced by others, and the said merchandise has acquired a reputation in connection with such mark or expression, and another person, without the consent of said manufacturer, uses the said mark or expression, the protection of the courts can be invoked.   The right to the exclusive use of such mark can only exist, however, where it has been applied to goods manufactured by the party claiming the use, or his assignors, and the goods have acquired a reputation in connection therewith.   A mark thus appropriated and used is called a "trade-mark," and it gives the owner thereof no right of property to prevent others from manufacturing, producing, or selling the same article to which it is attached, but the owner has a proprietary right to the mark which the law will protect.   This right, when exclusive, entitles the owner to restrain every other person from using in any manner the same or similar devices or marks, words, or expressions, and from holding out to the public that he is selling the identical article manufactured, produced, or sold by the other.   Not every word or expression, however, can be thus utilized.   Whether the word, name, or expression is or is not a lawful trade-mark depends upon

the facts of the case. In Fischer v. Blank, (N. Y. App.) 33 N. E. Rep. 1040, speaking of controversies like the one under discussion, the court of appeals said: "Each case must, in a measure, be a law unto itself." There is no exclusive right in the use of marks, symbols, or letters which merely indicate the appropriate name, mode, or process of manufacture, or the peculiar or relative quality of the fabric manufactured, as distinguished from the marks which indicate the name, origin, or ownership of the fabric. Manufacturing Co. v. Spear, supra. In Koehler v. Sanders, 122 N. Y. 72, 25 N. E. Rep. 235, the court of appeals said:

"In referring to the principles relating to trade-marks, and upon which their efficiency as such depends, it may be observed that there is no exclusive right to represent by them an idea, nor can there be an exclusive appropriation of that which is descriptive of the articles to which they are attached, or that which indicates their ingredients, mode of composition, characteristic properties, quality, or nature;" citing Enoch Morgan's Sons Co. v. Troxell, 89 N. Y. 292; Manufacturing Co. v. Spear, 2 Sandf. 599; Caswell v. Davis, 58 N. Y. 223.

The limits from which a choice may lawfully be made are clearly defined in the case of Selchow v. Baker, 93 N. Y. 59. In that case the court of appeals said:

"No person can appropriate to himself exclusively any word or expression properly descriptive of the article, its qualities, ingredients, or characteristics, the right to the use of such language being common to all. But a name which does not in itself indicate what the article is, or what are its qualities or component parts, but which is invented or adopted by a manufacturer solely for the purpose of distinguishing his products, and whose exclusive appropriation to that purpose in no way restricts others from properly describing similar articles produced by them, may be appropriated as a trademark, and protected as such."

Furthermore, the name so selected for the purposes of a trademark must be a name that has never before been applied to such articles. It must be "an arbitrary or fanciful name, and not in itself descriptive of the article." The general rule laid down in the case of Canal Co. v. Clark, 13 Wall. 322, is as follows:

"The office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed, or to give notice who was the producer. This may in many cases be done by a name, a mark, or a device, well known, but not previously applied to the same article. * * * An exclusive use can never be successfully claimed of words in common use previously, as applied to similar articles."

Whether the name is generic and descriptive, or fanciful and arbitrary, depends as often upon extrinsic facts as upon those which are inherent. To persons who have no technical knowledge of a particular thing, a name cannot be said to be a descriptive term, except it has been in common use for a particular purpose, unless it in itself denotes qualities or characteristics by which the article may be distinguished from others of a similar character. The law accords to the manufacturer the exclusive right to a fanciful or arbitrary name, as designating an article to which he is the first to apply it. This is a just reward to

the manufacturer for his ingenuity and effort, and deprives no other person of any rights. It leaves to others the full right to describe by appropriate language or words any article they have the right to produce and vend.

In Newman v. Alvord, 49 Barb. 588, the court (Daniels, J.,) said:

"Where words or names are in common use, the law does not permit such an appropriation of them to be made, so far as they are comprehended by such use; and, for that reason, words and names having a known or established signification cannot, within the limits of such signification, be exclusively appropriated to the advancement of the business purposes of any particular individual, firm, or company. The inability to make such appropriation of them arises out of the circumstance that, on account of their general or popular use, every individual in the community has an equal right to use them; and that right is, in all cases, paramount to the rights and interests of any one person, firm, or company. What may alike be claimed and used by all cannot be exclusively appropriated to advance the interests of any person."

Although a manufacturer and seller has not an exclusive property in the mark, device, word, or expression that he seeks to use as a trade-mark, if it is such as he may lawfully use to distinguish his property, and by the use has acquired a trade which is valuable, another cannot divert his trade by any practice designed to mislead his customers, whether the acts consist in simulating labels or representing in any other way his products as those of the former. A dealer has no right to simulate tokens which tend to confuse the identity of his business with that of another, and by false representations of facts attempt to mislead the public and divert custom from the latter. "One man must not adopt anything which will deceive people by making them believe that the article sold by him is the article known as the article of a certain name sold by another man." Read v. Richardson, 45 Law T. (N. S.) 54; Apollinaris Co. v. Scherer, 27 Fed. Rep. 18; Celluloid Manuf'g Co. v. Cellonite Manuf'g Co., 32 Fed. Rep. 94; Von Mumm v. Frash, (Benedict, J., filed June 7, 1893,) 56 Fed. Rep. 830; Association v. Piza, 24 Fed. Rep. 149.

It is not denied that neither at the time Dr. Jaeger and William Benger's Sons assigned to the plaintiff any cause of action which they, or either of them, had against the defendant by reason of the acts herein complained of, nor at any other time, did they, or either of them, have the exclusive right to manufacture and vend the underwear to which they applied the name "Jaeger" or "Dr. Jaeger." It is the privilege of the defendant, unmolested by plaintiff or by any person, to manufacture and vend underwear of precisely the same qualities and characteristics as that produced by plaintiff. The plaintiff has no proprietary rights to the kind or quality of fiber of which it makes its products, nor to the style of construction, color, or weight thereof.

The history of the promulgation and growth of Dr. Jaeger's system of clothing must be gathered from conflicting testimony. Gottlieb Benger, of the firm of William Benger's Sons, of Stuttgart, Germany, large stockholders in the plaintiff corporation, testifies as follows:

"I am quite sure that Dr. Jaeger did not make, before November, 1879, public lectures concerning his system of manufacturing clothes. The first lecture of this kind was held at the hall of Paul Weiss' Beer Brewery, at Stuttgart, on February 22, 1880."

In circulars and books, however, issued by the plaintiff or its assignors, are set forth essays and lectures, or extracts therefrom, by Dr. Jaeger, written long before February, 1880. The truth of the statements contained in these books and circulars—which, in a certain sense, are declarations of the plaintiff bearing upon the question of plaintiff's right to the name "Jaeger" as a trade-mark —cannot be denied. In an essay published by Dr. Jaeger in 1880, I find the following statement:

"Two years ago my manner of clothing had already taken root in all the states of Europe, and also in North America, but most largely in Germany, Austria, and Finland, where there was no large city to be found in which there were not a great number of persons wearing 'Normal Clothing.' "

In another essay by Dr. Jaeger, published in 1879, is the following statement:

"I could produce a goodly number of persons from among my audience and acquaintances who have followed my advice and put on the 'Jaeger Uniform,' as my friends jokingly call the clothing recommended by me."

Also, in another essay, published in the same year, he says:

"I have received a number of written questions from the readers of the paper who wish to put on the 'Jaeger Uniform.' "

Since the statement of Gottlieb Benger on this point is no stronger than that "I am quite sure," I cannot resist the conclusion, upon the whole case, that the system of clothing recommended by Dr. Jaeger had been quite extensively adopted and used in Germany prior to 1879; and that, before Dr. Jaeger established business relations with William Benger's Sons in 1879, he had freely given to the world his devices and ideas in respect of a system of clothing. Dr. Jaeger was a professor of zoology in the city of Stuttgart, in Germany, and there is evidence which tends to show that he advocated, in publications and lectures, a system of clothing as early as 1872. His attitude before the public in relation to his discoveries and theories in respect to clothing, up to some time in 1879, seems to have been that of a philanthropic scientist. Gottlieb Benger testifies that the firm of William Benger's Sons first commenced to manufacture the underwear, now known under the name of "Jaeger Underwear," or "Dr. Jaeger Underwear," or "Dr. Jaeger's Normal Underwear," in October, 1879, and that before this time there was no underwear in the market known by any of said names. Alfred N. Loeb, a witness called by defendant, and a member of the firm of Loeb Bros., rival manufacturers of William Benger's Sons at Stuttgart, Germany, and the manufacturers of so-called "Jaeger" goods sold by the defendant, states that, so far as he knows, William Benger's Sons were the first persons to use the name "Jaeger" in connection with underwear. At this time the trade-mark law in Germany did not give protection to symbolical marks or words, and the words in

question could not be registered by any manufacturer and an exclusive use thereof acquired in the German empire. It appears from the testimony that about this time Gottlieb Benger, of the firm of William Benger's Sons, conceived the idea of commercially exploiting the theories presented to him by Dr. Jaeger, and arrangements were thereupon entered into by William Benger's Sons for the manufacture of the underwear, with the co-operation of Dr. Jaeger, under contracts with him, and they soon manufactured and sold underwear under the designation containing the name "Jaeger" or "Dr. Jaeger." From the testimony it may reasonably be inferred that this idea of Mr. Gottlieb Benger did not have its origin in any private communications between himself and Dr. Jaeger, but from the publications of Dr. Jaeger. In answer to the first cross interrogatory put to Mr. Benger, in the commission under which he was examined in Germany, he makes this statement: "The time when I entered into business connection with Professor Jaeger was the same time when I made his personal acquaintance." At the time of the making of the agreement between Dr. Jaeger and William Benger's Sons, Dr. Jaeger was not a merchant or manufacturer, and had not acquired a trade-mark or trade-name. He had never manufactured and sold goods and attached thereto the trade-mark alleged, and therefore never "acquired such proprietary right, even though he may have originated the mark, which justifies the granting of concessions which can be protected by the courts." Jaeger's Co. v. Le Boutillier, 47 Hun, 521. Neither the plaintiff nor its assignors acquired any trade-name rights from Dr. Jaeger. He never had any to grant. The trade of the plaintiff and its assignors did not commence in the United States until some time in 1886,—just at what time does not appear. I hold that at the time William Benger's Sons established their sole agency in the United States, in 1886, they had no exclusive proprietary rights in the United States in the name "Jaeger," as applied to underwear. In my opinion, the testimony tends to establish the fact that William Benger's Sons never acquired in Germany an exclusive proprietary right to the name "Jaeger," as applied to underwear; but if they did acquire such right there, they could not export it to the United States, where they had no trade, assert it here, and deprive our merchants of the right to the use of a name which they had availed themselves of for some time before the advent in this country of the plaintiff's predecessors.

In 1886 certain persons obtained the sole agency for the United States for the underwear manufactured at Stuttgart, Germany, by William Benger's Sons, and designated "Jaeger," or to which the name "Jaeger" was by them applied. The plaintiff, at the time of its organization, in 1887, succeeded to such rights as these agents had acquired. William Benger's Sons did not bring to their agency in the United States, in 1886, any exclusive proprietary rights in the name "Jaeger," as applied to underwear. The plaintiff has no rights in respect of such name, except such as it or its

assignors have acquired in the United States, since the estab-
lishment of the sole agency of William Benger's Sons' in 1886. The
plaintiff has not succeeded in establishing by the proofs that it
or its assignors were the first in the United States to designate
underwear made on the Jaeger system by the name or term
"Jaeger." Among other evidence to the same effect appears the
following: It is testified that B. Altman & Co. published in news-
papers in the city of New York, as early as January 11, 1886, and
at other times in January and February of that year, advertise-
ments that they sold Jaeger goods, and advertised them as such.
They state in those advertisements that they have for sale "Dr
Jaeger's Ladies' Hygienic Natural Wool Underwear." All through
the year 1886, McCreery & Co. advertised and sold underwear
as "Jaeger Underwear," made on the "Jaeger System." Mr. Tal-
bot, the European buyer for McCreery & Co., testifies that goods
sold by McCreery & Co. as Jaeger goods were not made by William
Benger's Sons, and that from the year 1886 down to the present
time they sold and sell goods made on the Jaeger system, and sold
and sell them, as such to their customers. Charles Warner tes-
tifies that in the year 1885 he represented in New York city the
German house of Gerbruder Herforth, and sold Jaeger goods, and
so designated them, and that he imported Jaeger underwear made
by Gerbruder Herforth, and advertised them as Jaeger goods, and
that in 1884 he sold Jaeger goods and called them such, and ad-
vertised them in a paper called the Dry Goods Economist. It will
be noted that this underwear sold by Mr. Warner was not made
by the firm of William Benger's Sons. Prior to the attempt of
the plaintiff or its assignors to acquire an exclusive proprietary
right in the name "Jaeger" as a trade-mark for underwear, the
name "Jaeger," by the tacit consent of Dr. Jaeger, if not other-
wise, had come to signify in the trade, not a particular manufacture
of the plaintiff, William Benger's Sons, and Dr. Jaeger, or any of
them, but a distinctive kind of underwear, with special charac-
teristics, originated by Dr. Jaeger. There is nothing in the name
"Jaeger," as applied to underwear manufactured or sold by the
plaintiff, to distinguish it from the same kind of underwear made
by others. The signification acquired by the name "Jaeger" is
such that the name is as true in its application to the all-wool goods
made upon the Jaeger system, sold by defendant, as to the goods
sold by plaintiff. The appellation "Jaeger" has no relation to
the origin or ownership of the goods, but only indicates their name,
style, or quality. The name "Jaeger," as applied to underwear, im-
plies an "idea." The plaintiff can have no exclusive right to repre-
sent by the name "Jaeger" the ideas which Dr. Jaeger originated
and promulgated in respect of a system of clothing. The name
had acquired a technical meaning, as descriptive of a class of
goods well known in the trade, and, within the limits of such
signification, could not be exclusively appropriated for the pur-
pose of advancing the business interests of any particular indi-
vidual, firm, or company. After giving due weight to all the evi-

dence, and applying thereto the law as above laid down, it must be held (1) that the name "Jaeger" is descriptive of a class of goods well known in the dry-goods trade in this country and in Europe; (2) that the plaintiff and its assignors were not the first to use the name "Jaeger," as applied to underwear, either in the United States or in Germany; and (3) that the plaintiff has not the exclusive right to use the name "Jaeger" to designate underwear made according to the Jaeger system.

The following charges in the complaint remain to be considered, and they may be stated, in substance, as follows, to wit: That defendant palms off his own goods as the goods of the plaintiff; that among the goods so sold by defendant were goods with an admixture of cotton, producing an inferior article, intending to throw discredit upon the reputation of plaintiff and on the goods dealt in by it; that, in selling his goods over the counter, defendant represents them as the same goods sold by Dr. Jaeger's Company; and that the effect of such alleged imitation, sale, and advertising is calculated to and does deceive the purchasers and users of plaintiff's goods to buy the goods sold by defendant, in the belief that they are the said articles dealt in by the plaintiff.

What is the Jaeger system of clothing as applied to underwear? The defendant alleges in his answer that Dr. Jaeger "did, in Germany, originate a system of manufacturing and wearing woolen undergarments." Plaintiff's claim is that the Jaeger system calls for underwear made "exclusively of animal fiber, namely, the best and finest pure wool, without any admixture of vegetable fiber whatever." The learned counsel for the defendant, in his brief, claims that the testimony in the case shows that Dr. Jaeger advocated a system of clothing which, as to underwear, prescribes that "it should be made of all wool, stockinet, undyed or natural gray, very porous, agreeable, and durable." The system, as thus claimed by the defendant, I can safely hold the proofs herein have established. It appears from the testimony that the underwear which the defendant has been pleased to designate by the name "Jaeger" has been made for him or purchased by him of Loeb Bros., of Stuttgart, Germany. Loeb Bros. are large and reputable manufacturers. Their product comes in direct competition with the product of William Benger's Sons. The factory of Loeb Bros. has such advantages of climate and location as that possessed by the factory of William Benger's Sons; has the same kind of machinery; and both concerns purchase the yarn that enters into their respective products largely from the same dealers. From an inspection of the large number of exhibits, consisting of underwear put in evidence by the plaintiff and the defendant, and after carefully considering the evidence of experts as to quality, I am of opinion that there is no substantial difference in the quality of material or in the skill of the manufacture of the respective exhibits of said underwear, when the comparison is confined to the garments that are all wool. I have not overlooked the testimony which tends

to show that, in the manufacture of some of defendant's exhibits of underwear, shoddy was found, and that they were also found to contain imperfect and dyed fibers. The conclusion must be that such shoddy, dyed, and imperfect fibers as are found in the all-wool exhibits of defendant's underwear were the results of chance or accident, and were not intentionally employed in the construction of the goods. It is established by testimony that the defendant has from time to time ordered from Loeb Bros., and they have manufactured for him in Stuttgart, Germany, underwear containing an admixture of cotton fiber. The amount of cotton used in the making of these garments has varied from a small percentage of cotton up to upwards of 50 per cent. of cotton. These garments, however, in color, weight, and general appearance, so closely resemble the all-wool garments made after the Jaeger system as to make it impossible for even those who are daily handling the goods to distinguish the garments containing an admixture of cotton from those which are all wool. It appears from the testimony that the underwear containing a substantial admixture of cotton has been designated "Jaeger Underwear" by defendant, and sold as "Jaeger Underwear." It can be said that in many instances, and perhaps the evidence warrants the finding even that generally, the defendant has taken means to notify customers and the public that the underwear sold by him, containing an admixture of cotton, was not all pure wool. It is, nevertheless, true that underwear has been sold by defendant for Jaeger underwear, or underwear made after the Jaeger system, that contained an admixture of cotton. The proofs show that the defendant is now selling, for "Genuine Jaeger Underwear," goods that are part cotton. It is his contention that, in doing so, he does not violate the Jaeger system. I cannot agree with this view. The defendant testified that he did not understand the use of an admixture of cotton fiber with the wool fiber, in the manufacture of the underwear, to be a deviation from the Jaeger system. It was further testified in behalf of defendant that the cotton was used for the purpose of preventing shrinkage, and because its use was believed to cure a defect in the Jaeger system, and to be an improvement upon the all-wool garment. I need not undertake to decide whether it is or is not an improvement, or whether the advantage in practical use is with the all-wool garment or with the garment containing an admixture of cotton. The testimony clearly shows, and it must be held, that the use of any but animal fiber, and hence the use of cotton fiber, in the manufacture of underwear, is a deviation from the Jaeger system, and cannot be employed, except in violation of that system and the rules prescribed by Dr. Jaeger for the system of clothing originated by him. The exclusive use of pure wool in the manufacture of underwear upon the Jaeger system is its most essential feature.

The testimony shows that the plaintiff has dealt only in underwear made of pure fine wool upon the Jaeger system; that it has uniformly and always designated its underwear, in some form of

expression, as "Jaeger Underwear;" and that it has established a large trade for that article, which is valuable to it.  It has a qualified right to the name "Jaeger," as applied to all-wool underwear made upon the Jaeger system.  The plaintiff's right to use the name "Jaeger," as designating underwear made in accordance with the Jaeger system, is so qualifiedly exclusive that its right to protection of its use against infringement by others rests upon the ground that such use by them is an untrue or deceptive representation.  Koehler v. Sanders, supra.  The application of the name "Jaeger," or "Jaeger System" to underwear containing an admixture of cotton is an untrue and deceptive representation, and, as against such a use, the plaintiff is entitled to relief.  It is a false representation of fact, which tends to confuse the identity of the defendant's goods, not made after the Jaeger system, with the goods of the plaintiff, made in accordance with that system, and creates a dishonest competition, detrimental to the plaintiff. One of the uses by the defendant of the name "Jaeger" to designate underwear containing an admixture of cotton must be held to be for the purpose of taking advantage of the reputation the all-wool Jaeger goods have acquired, and of the Jaeger name, as applied thereto.  The application of the name "Jaeger" by the defendant to goods part cotton tends to deceive the purchasers and users of plaintiff's goods, and actually mislead them into buying the goods containing cotton sold by defendant, in the belief that they are the goods dealt in by the plaintiff.  Moreover, since the goods containing an admixture of cotton can be profitably sold at a less price than the all-wool goods, the tendency must be to unfairly divert custom from the plaintiff to the defendant.

Upon the grounds above set forth, I hold that the plaintiff has shown the defendant guilty of unfair competition in advertising and selling as "Genuine Jaeger Underwear" underwear containing a substantial admixture of cotton, and that the plaintiff is entitled to an accounting, accompanied by an injunction.  As to the extent of the injunction to be awarded, I am of the opinion that the defendant should be prohibited from advertising in the newspapers, or otherwise, or in any way representing, that the underwear sold by him, containing an admixture of cotton, is "Jaeger Underwear," or "Dr. Jaeger's Underwear," and from so using the words "Jaeger" or "Dr. Jaeger" in connection with the word "Genuine," or any other word or words, and from advertising or representing his said underwear by any designation containing the words "Jaeger" or "Dr. Jaeger," alone, or in combination with other words.   Let the proposed findings be amended to conform to this opinion, and a decree may be entered in favor of the plaintiff to the extent indicated.